UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This document applies to:                                            09 MD 2017 (LAK)

*Vallejo Sanitation and Flood Control District v. Fuld, et al.*,
 09 Civ. 6040 (LAK)

*Monterey County Treasurer, on Behalf of the Monterey
County Investment Pool v. Fuld, et al.*, 09 Civ. 1944 (LAK)

*Contra Costa Water District v. Fuld*, 09 Civ. 6652 (LAK)

*City of Burbank v. Fuld*, 09 Civ. 3475 (LAK)

*City of San Buenaventura v. Fuld*, 09 Civ. 3476 (LAK)

*City of Auburn v. Fuld*, 09 Civ. 3474 (LAK)

*The San Mateo County Investment Pool v. Fuld*,
09 Civ. 1239 (LAK)

*Zenith Insurance Co. v. Fuld*, 09 Civ. 1238 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OPINION

        Appearances:

Joseph W. Cotchett                         Mitchell A. Lowenthal
Jordanna G. Thigpen                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
Mark C. Molumphy                           *Attorneys for Underwriter Defendants Except
Nanci E. Nishimura                         HVB Capital Markets, Inc. and M.R. Beal &
Imiatz A. Siddiqui                         Co.*
COTCHETT, PITRE & MCCARTHY
*Attorneys for Plaintiffs*
                                           Mark P. Ressler
                                           KASOWITZ, BENSON, TORRES & FRIEDMAN,
Martin J. Auerbach                         LLP
LAW OFFICES OF MARTIN J. AUERBACH, ESQ.    *Attorneys for Defendant HVB Capital
*Attorney for Defendant Ian Lowitt*        Markets, Inc.*
James G. Kreissman

SIMPSON THATCHER & BARTLETT LLP
*Attorneys for Defendants Richard S. Fuld,*
*Jr., Joseph M. Gregory, Erin Callan, Ian*
*Lowitt, John F. Akers, Roger S. Berlind,*
*Marsha Johnson Evans, Roland A.*
*Hernandez, and Henry Kaufman*

Andrew J. Levander
Kathleen N. Massey
Adam J. Wasserman
DECHERT LLP
*Attorneys for Defendants John F. Akers,*
*Roger S. Berlind, Marsha Johnson Evans,*
*Roland A. Hernandez, and Henry Kaufman*

Jamie L. Wine
LATHAM & WATKINS LLP
*Attorneys for Defendant Ernst & Young LLP*

Joseph A. Mendola
M.R. BEAL & COMPANY
*Attorney for Defendant M.R. Beal & Co.*

Guy Petrillo
Joshua Klein
PETRILLO KLEIN & BOXER LLP
*Attorneys for Defendant Christopher M.*
*O'Meara*

Joshua J. Pollack
PROSKAUER ROSE LLP

Alfred U. Pavlis
FINN DIXON & HERLING LLP

*Attorneys for Defendant Erin Callan*

Table of Contents

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    I.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    II.    The CFAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    III.    Motions to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    I.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    II.    Securities Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        A.    Timeliness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        B.    The Sufficiency of the Remaining Section 11 Claims . . . . . . . . . . . . . . 17
            1.    Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . 17
            2.    The Present Case . . . . . . . . . . . . . . . . . . . . . . . . . 18
                a.    Alleged Misstatements and Omissions Dismissed in the E/D Class Action . . . . . . . . . . . . . . . . . . . . 19
                b.    Viability in this Case of Alleged Misstatements and Omissions Upheld as Sufficient in the E/D Class Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                c.    Section 11 Claims against Callan . . . . . . . . . . . . 32
                d.    Section 11 Claims against Ernst & Young . . . . . . . . . . 34
        C.    Section 15 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    III.    Exchange Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        A.    10b-5 Claim as to the Officer Defendants . . . . . . . . . . . . . . . . . . . 39
            1.    Existence of Materially False and Misleading Statements or Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
            2.    Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
                 a.    Motive and Opportunity . . . . . . . . . . . . . . . . . . . . 40
                 b.    Circumstantial Evidence of Conscious Misbehavior or Recklessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        B.    Section 20(a) Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    IV.    Common Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        A.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        B.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        C.    Aiding and Abetting Fraud . . . . . . . . . . . . . . . . . . . . . . . 54
        D.    Negligent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . 56
    V.    The Fraudulent Conveyance Claim . . . . . . . . . . . . . . . . . . . . . . . 57
    VI.    California Corporations Code Claims . . . . . . . . . . . . . . . . . . . . . . 58
        A.    Sections 25400 and 25500 . . . . . . . . . . . . . . . . . . . . . . . 58
            1.    Type of Securities Bought and Sold . . . . . . . . . . . . . 59
            2.    Willful Intent . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        B.    Sections 25504 and 25504.1 . . . . . . . . . . . . . . . . . . . . . . 61
        D.    Section 25504.2 Claims as to Ernst & Young . . . . . . . . . . . . . . . . . 65

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

LEWIS A. KAPLAN, *District Judge.*

      The September 2008 collapse of Lehman Brothers Holdings Inc. ("Lehman") spawned litigation across the country.  The Lehman bankruptcy is pending in the bankruptcy court for this district.  All of the securities and most of the other cases brought in or removed to federal courts have been consolidated before this Court for pretrial purposes.   The cases that are the subject of this opinion are eight consolidated securities actions brought by seven California public entities and a California-based insurance company.  They assert claims against Lehman's former officers, directors and auditors under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and California state law, and they are before me on motions to dismiss.  Three circumstances are pivotal to these motions.

      First, the bankruptcy court in the Lehman bankruptcy appointed an examiner to inquire into and report, broadly speaking, as to the circumstances that culminated in Lehman's failure.  In 2010, the examiner rendered comprehensive a 2,200 page, nine-volume report.[1]

      Second, the plaintiffs in a consolidated class action brought on behalf of purchasers of Lehman debt and equity securities, *In re Lehman Brothers Equity/Debt Securities Litigation* ("*E/D Class Action*"), amended their complaint to take advantage of the wealth of factual material in the Examiner's Report, which resulted in these plaintiffs filing an extraordinarily detailed third amended complaint (the "TAC").   In due course, the Court granted in part and denied in part extensive motions to dismiss.[2]

---

[1]

      Report of Anton R. Valukas, Examiner, *In re Lehman Brothers Holdings, Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010), DI 7531 (hereinafter referred to as the "Examiner's Report" or "ER.")

[2]

      *In Re Lehman Brothers Sec. and ERISA Litig.,*799 F. Supp.2d 258 (S.D.N.Y. 2011) (hereinafter "*E/D Class Action I*").

Finally, the consolidated first amended complaint in these eight actions (the "CFAC"), like the TAC in the *E/D Class Action*, rests very heavily on allegations drawn from the Examiner's Report, asserts claims under the Securities and Exchange Acts, and therefore is quite similar in many respects to the TAC. Like the *E/D Class Action* plaintiffs, these plaintiffs contend principally that Lehman's offering documents with respect to Lehman securities that plaintiffs purchased were false and misleading, as they incorporated by reference Lehman financial statements which in turn contained misleading statements and material omissions regarding Lehman's (1) risk management policies, (2) liquidity risk, (3) use of "Repo 105" transactions and their effect on Lehman's reported net leverage, (4) valuation of its commercial real estate holdings, and (5) concentrations of credit risk. In addition, as the CFAC was filed after the ruling on the motions to dismiss in the *E/D Class Action,* it attempts also to plead facts additional to those asserted in that case in an effort to support claims that were dismissed in the *E/D Class Action.*

The Court has concluded, broadly speaking, that the CFAC, like its predecessor in the *E/D Class Action,* is sufficient in some respects and deficient in others. Accordingly, the motions to dismiss are granted in part and denied in part.

3

*Background*

I.     *Parties*

A.     *Plaintiffs*

Plaintiffs in this case collectively made twenty-one separate purchases of Lehman securities (the "Purchases") in 15 different offerings (the "Offerings") during the period October 25, 2004 to March 31, 2008.[3]   The identities of the securities they purchased, their purchase dates, and the dates on which they commenced their actions are set forth in the appendix to this decision.[4]

B.     *Defendants*

The defendants fall into five categories:[5]

• The Officer Defendants – Erin Callan, Richard S. Fuld, Christopher M. O'Meara, Joseph M. Gregory, and Ian Lowitt.  Fuld was Lehman's chairman and chief executive officer.[6]  O'Meara was its chief financial officer, controller, and executive vice president from 2004 until December 1, 2007,

---

[3]

CFAC [DI 530], ¶ 1 & Appx. A.

[4]

All of these cases were commenced in the California state courts, removed to federal courts, and transferred here for coordinated or consolidated pretrial proceedings.

[5]

Lehman and Lehman Brothers, Inc. ("LBI") are not defendants.

[6]

Fuld was the chief executive officer and chairman of the board from 2000 until 2008.  He signed each Form 10-K that Lehman filed with the Securities and Exchange Commission ("SEC") during this time.  From 2002, when the Sarbanes-Oxley Act ("SOX") was enacted, until 2008, he signed each certification on Lehman's Form 10-Ks and.  He signed each of the Registration Statements as well.  CFAC ¶ 91.

when he became the global head of worldwide risk management.[7]  Gregory was Lehman's president and chief operating officer from May 2004 until June 2008.[8]  Callan served as chief financial officer and executive vice president from December 2007 until June 12, 2008.[9]  Lowitt then succeeded Callan as chief financial officer on June 12, 2008, and remained in that position until Lehman filed for bankruptcy on September 15, 2008.[10]

- The Director Defendants – five former Lehman directors[11] – all served on Lehman's Finance and Risk Committee, which had the "responsibility to review and advise the Board of Directors on the financial policies and

---

[7]

As controller, O'Meara "supervised Lehman's internal accounting programs and procedures." *Id.* ¶ 92.  In his role as head of risk management, he was "responsible for supervising Lehman's risk mitigation strategies and procedures." *Id.*  From 2004-2007, when he served as chief financial officer, he signed every Lehman Form 10-K and 10-Q filed with the SEC, including each of the certifications.  He signed also Lehman's 2005 and 2006 Registration Statements.  *Id.*

[8]

Gregory resigned as chief operating officer and president at this time.  Prior to this, from May 2002 until May 2004, he had been Lehman's co-chief operating officer.  As chief operating officer, he "oversaw the day-to-day management of Lehman's operations." *Id.* ¶ 93.

[9]

Callan joined Lehman in 1995.  Prior to being controller, she had worked in various positions, including head of the Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions Group, and Global Finance Analytics Group.  She signed Lehman's 2007 Form 10-K and its first quarter 2008 Form 10-Q, as well as certification statements on each of these forms.  *Id.* ¶ 94.

[10]

Lowitt joined Lehman in 1994. He served as the co-chief administrator officer from October 2006 onward, where he was "responsible for global oversight of Risk Management."  He signed Lehman's second quarter 2008 10-Q.  *Id.* ¶ 95.

[11]

John F. Akers, Roger S. Berlind, Marsha Johnson Evans, Roland A. Hernandez, and Henry Kaufman.  *Id.* ¶¶ 98-102.

practices of the company, review[ed] significant capital transactions and respective risks involved, and ensur[ed] the accuracy and completeness of applicable public filings they signed."[12] Each of them is alleged to have signed at least one of the Lehman 2001, 2005 and 2006 Registration Statements (the "Registration Statements").[13]

- The twenty-four Underwriter Defendants,[14] financial institutions that underwrote portions of the Offerings that plaintiffs purchased.

- Ernst & Young LLP ("E&Y"), Lehman's outside auditor for the relevant time period. Its audit opinions were incorporated by reference into the Registration Statements and the relevant offering documents for the securities at issue in this case.[15]  It reviewed interim financial statements

---

[12]

    *Id.* ¶ 103.

[13]

    Akers, Berlind, and Kaufman signed all three Registration Statements, as well as all Form 10-Ks filed during the relevant time period.  Evans signed the 2005 and 2006 Registration Statements, as well as all of Lehman's Form 10-Ks filed during her tenure, from "2004" until "September 15, 2008."  Hernandez signed the 2006 Registration Statement as well as all of Lehman's Form 10-Ks filed during his tenure, from "2005" to "September 15, 2008." *Id.* ¶¶ 98-102.

[14]

    ABN Amro Holding N.V. (n/k/a RBS Holdings N.V.); ANZ Securities, Inc.; Banc of America Securities, LLC; BBVA Securities, Inc.; BNP Paribas S.A.; Calyon Securities (USA) Inc.; Citigroup Global Markets Inc.; Commerzbank Capital Markets Corp.; Daiwa Capital Markets Europe Ltd. (f/k/a Daiwa Securities SMBC Europe Ltd.); Fortis Securities, LLC; Harris Nesbitt; HSBC Securities (USA) Inc.; HVB Capital Markets, Inc.; ING Financial Markets, LLC; Loop Captial Markets, LLC; Mellon Financial Markets, LLC (n/k/a BNY Mellon Capital Markets, LLC); M.R. Beal & Co.; Natixis Bleichroeder Inc.; RBS Greenwich Capital; Santander Investment Securities Inc.; Siebert Capital Markets; Societe General Corporate & Investment Banking; SunTrust Robinson Humphrey, Inc.; and Wells Fargo Securities, LLC. *Id.* ¶¶ 109-32.

[15]

    CFAC ¶¶ 3, 107.

during this time as well.[16]

- Kathleen Fuld, the wife of Richard Fuld.[17]  She is named only in a fraudulent conveyance claim.[18]

## II.    The CFAC

The CFAC alleges that plaintiffs' purchases all were made pursuant to the Registration Statements,[19] which were supplemented or amended by prospectuses, prospectus supplements, product supplements and pricing supplements.[20] Plaintiffs – largely tracking the allegations of the TAC in the *E/D Class Action* – assert that the Offering Documents made false statements as to material facts, omitted to state facts necessary to make the statements that were made not misleading, or breached duties to disclose material facts in a number of areas.  The principal claims relate to Lehman's (1) alleged use of Repo 105 to reduce reported net leverage, (2) alleged overstatement of the value of real estate assets, (3) allegedly misleading disclosures regarding its liquidity, risk management practices, and concentrations of risk, and (4) accounting

---

[16]

    *Id.* ¶ 106.

[17]

    *Id.* ¶ 134.

[18]

    *Id.* ¶¶ 545-50.

[19]

    *Id.* at 1 n.2.  The CFAC defines "Registration Statements" to include (1) the Form S-3 filed on May 9, 2001, and amended on Form S-3/A on June 5, 2001 (the "2001 Registration Statement"), (2) the Form S-3 filed on December 8, 2004, and amended on Form S-3/A on May 16, 2005 (the "2005 Registration Statement"), and (3) the automatic shelf registration statement filed on Form S-3 on May 30, 2006, as amended on Form S-3/A on June 5, 2006 (the "2006 Registration Statement").

[20]

    Collectively, the "Offering Documents."

practices.  These claims are brought under Sections 11 and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act against individual defendants and E&Y and under various provisions of California common law and statutes against varying groups of defendants.

The allegations of the CFAC in this case are not identical to those in the TAC in the *E/D Class Action*.  But they are quite similar and relate to the same alleged disclosure failures and fraud by Lehman.  As these are set out in considerable depth in *E/D Class Action I*,[21]  it is unnecessary to recapitulate all of the alleged disclosure irregularities in detail.  The Court therefore reserves discussion of specific allegation bases of liability to those points at which these plaintiffs argue that a different result is warranted here by virtue either of new authority or of differences between the pleadings at issue in the two cases.

III.    *Motions to Dismiss*

This decision deals with four motions to dismiss portions of the CFAC.

The first motion was brought by the Individual Defendants,[22] who challenge, *inter alia*, (1) the timeliness of certain of plaintiffs' Securities Act claims, (2) the existence of actionable misstatements or omissions alleged in plaintiffs' Securities Act and Exchange Act claims, (3) whether plaintiffs adequately have alleged *scienter* as to their Exchange Act claims, (4) all of plaintiffs' common law claims, for reasons similar to those they raise in challenging both the Securities Act and the Exchange Act claims, and (5) all of plaintiffs' claims under the California

---

[21]

        *E/D Class Action I,* 799 F. Supp.2d at 267-72 (describing plaintiffs' allegations), 275-92 (analyzing sufficiency of allegations of material falsity), 292-304 (analyzing *scienter* allegations).

[22]

        DI 633.

Corporations Code, again for largely similar reasons.[23]

All but three of the Underwriter Defendants challenge the only claim in the CFAC in which they are named, that under California Corporations Code Section 25504.[24] They assert that (1) plaintiffs' claims are barred by the applicable statutes of limitations and of repose, (2) plaintiffs have failed adequately to plead their Section 25504 claim, (3) the only remedy available to those plaintiffs who still hold the securities on which their claims are based is rescission, which the Underwriter Defendants contend they cannot provide under California law, and (4) Zenith's claims under this section are precluded under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), as Zenith's suit is a "covered class action" under the statute.

Underwriter defendant HVB Capital Markets, Inc. ("HVB") separately moves to dismiss the consolidated actions in which it is named – those brought  by plaintiffs Vallejo and Contra Costa.[25]  It joins in the Underwriter Defendants' motion to dismiss.[26]  Its primary argument

---

[23]

    The Individual Defendant s incorporate by reference other motions to dismiss that they have filed in other cases that are a part of the MDL.  Most important of these is their memorandum in support of their motion to dismiss in *State Compensation Insurance Fund v. Fuld*, 11 Civ. 3892 (LAK), on which they rely heavily in briefing the motion presently before the court.  *See* DI 588; DI 766 (memorandum in support of motion to dismiss and reply memorandum in support of motion to dismiss in *State Compensation Insurance Fund*).

[24]

    DI 574.

[25]

    They are *Vallejo Sanitation and Flood Control District v. Fuld, et al.*, 09 civ. 6040 and *Contra Costa Water District v. Fuld, et al.*, 09 civ. 6652.  The purchases allege that HVB underwrote in part are CUSIP No.52517PXT3, purchased by Vallejo on January 22, 2008, and CUSIP No.52517PR60 purchased by Contra Costa on February 5, 2008.

[26]

    DI 596.

    HVB's motion seeks dismissal of three additional actions.  This decision does not address that request for relief.

is that the Section 25504 claim advanced against it – the only claim it faces – was untimely. It asserts also that the Section 25504 claim is insufficient.[27]

Finally, Ernst & Young too moves to dismiss.[28] It relies primarily on (1) joinder in certain arguments advanced by the Individual Defendants, particularly that certain of plaintiffs' Section 11 claims are barred by the three-year statute of repose set out by Section 13 of the Securities Act, (2) joinder in the Underwriter Defendants' motion to dismiss insofar as it asserts that there is not a valid claim under California Corporations Code Section 25504, and (3) incorporation of an argument made by certain underwriter defendants in *Washington State Investment Board v. Fuld,*[29] to the effect that the claims asserted against them based on Lehman's Repo 105 activity are barred by the statute of repose because those claims first were asserted against them in an amended complaint filed more than three years after plaintiffs purchased their securities.[30]

*Discussion*

I.  *Legal Standard*

---

[27]

      The HVB motion advances no arguments beyond those made in the Underwriter Defendants' motion to dismiss. Thus, to the extent the Underwriter Defendants prevail in their motion, HVB will prevail as well. The two remaining underwriters who did not participate in either HVB's motion or the general underwriters' motion to dismiss – M.R. Beal & Co. and Williams Capital Group – have joined in the Underwriter Defendants' motion. DI 616; DI 660.

[28]

      Ernst & Young's motion seeks dismissal not only of the CFAC, but many other actions now before the Court. DI 623. This decision addresses its motion only insofar as the motion attacks the CFAC.

[29]

      09 Civ. 6041.

[30]

      *See* DI 573; DI 773 (underwriter defendants' opening and reply memoranda in support of motion to dismiss in *Washington State Investment Board*, 09 Civ. 6401 (LAK)).

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[31]  In order to survive such a motion, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'"[32] and "state a claim for relief that is plausible on its face."[33]

When passing on such a motion, a court considers the complaint and "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[34]

If matters outside the pleadings are presented and not excluded, Rule 12(d) ordinarily requires a court to convert the motion to dismiss into one for summary judgment and to provide the parties with the opportunity to present all pertinent materials.[35]  That Rule, however, is aimed at

---

[31]

   *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[32]

   *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (declining to limit *Twombly* to antitrust cases).

[33]

   *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570) (internal citations omitted).

[34]

   *ATSI Commc'ns., Inc.*, 493 F.3d at 98.  Such documents ordinarily may be considered for that the that the statements they contain were made but not for the truth of their assertions. *E.g., Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir. 2008); *E/D Class Action I.,* 799 F. Supp.2d at 273.

[35]

   Fed. R. Civ. P. 12(d).

ensuring that the plaintiff has notice of what the court might consider in deciding the motion.[36]  The

need to convert a Rule 12(b)(6) motion into a summary judgment motion "is largely dissipated,"

however, when "plaintiff has actual notice of all the information in the movant's papers and has

relied upon these documents in framing the complaint."[37]  This is particularly true for documents

that are "integral to the complaint," but that the plaintiff has chosen not to attach or incorporate by

reference.[38]  In addition, a document that is integral to a complaint in the sense that the plaintiff had

actual notice of and relied upon it in framing the complaint, is properly considered, albeit not for the

---

[36]

*Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("A finding that plaintiff had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason – requiring notice so that the party against whom the motion to dismiss is made may respond – that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions."), *cert. denied*, 503 U.S. 960 (1992).

[37]

*Id.* (approving district court's consideration of stock purchase agreement and warrant that neither were attached as exhibits to the complaint nor publicly filed because plaintiffs had notice of the documents and they were integral to the complaint).

[38]

*Int'l Audiotext Network v Amer. Tel & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks omitted) (alterations in original); *see also id.* (holding that court properly could consider agreement on motion to dismiss even though not explicitly incorporated because it was "integral" and the complaint relied heavily upon its terms and effect); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that court properly considered thirteen contracts governing relationship between musicians and recording companies submitted with defendants' motion to dismiss because they were "integral" to complaint as plaintiffs relied on their terms and effect in drafting it).  *Cf. Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (finding that district court improperly considered documents that "were not attached as exhibits to the amended complaint nor . . . incorporated by reference" but that the complaint "merely discussed" and from which it "presented short quotations").

12

truth of the matters asserted,[39] notwithstanding that it has not been attached to or incorporated by

reference into the complaint.[40]

      Averments of fraud are subject to a higher standard.  Such assertions must satisfy the

heightened pleading standards of Rule 9(b) and, where applicable, the Private Securities Litigation

Reform Act ("PSLRA").[41]  Accordingly, the CFAC , to the extent it makes fraud claims, must "(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were fraudulent."[42]

      As to *scienter,* a complaint must "state with particularity facts giving rise to a strong

inference that the defendant acted with the requisite state of mind."[43]  The requisite state of mind

---

[39]

    *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008).

[40]

    The parties dispute the question whether the nine-volume Examiner's Report is properly
before the Court on the theory that it effectively has been incorporated by reference in the
TAC.  This appears to be relevant only to the effort of some defendants to obtain dismissal
based on the assertion that the facts and conclusions in the Report affirmatively demonstrate
that they acted with due diligence and therefore may not be held liable under the Securities
Act.  In view of the fact that the Report, even if it is integral to the TAC, could not properly
be considered for the truth of the matters asserted, the point is academic.  In any case, for
reasons discussed below, the Examiner's Report would not warrant dismissal of any claims
based on the due diligence defense  even if its statements and conclusions properly were
considered for their truth.

[41]

    *See Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001); *Segemen v. Weidner*, 780 F.2d
727, 729, 734-35 (9th Cir. 1985).

[42]

    *See* 15 U.S.C. § 78u-4(b)(1) (complaint must "specify each statement alleged to have been
misleading, the reason or reasons why the statement is misleading, and, if an allegation
regarding the statement or omission is made on information and belief, the complaint shall
state with particularity all facts on which that belief is formed.").

[43]

    15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314
(2007)

is an intent to "deceive, manipulate, or defraud."[44] Sufficient allegations of recklessness – "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" – satisfy the *scienter* requirement.[45]

In evaluating whether a complaint sufficiently pleads a "strong inference of *scienter*," courts must consider all the facts alleged, inferences favoring plaintiffs rationally drawn from the facts, as well as "plausible, nonculpable explanations for the defendant's conduct."[46]  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[47]

A complaint may plead *scienter* by alleging facts showing either that the defendants had both "a motive and an opportunity" to commit fraud or that there is "strong circumstantial evidence of conscious misbehavior."[48]  To establish a strong inference of *scienter* on the basis of motive and opportunity, plaintiffs must allege that defendants "benefitted in some concrete and

---

44

    *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 194 n.12 (1976).

45

    *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-70 (9th Cir. 1990) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45 (7th Cir 1977)).

46

    *Tellabs*, 552 U.S. at 324.

47

    *Id.*

48

    *Marksman Partners, L.P. v. Chantal Pharma. Corp.*, 927 F. Supp 1297 (C.D. Cal. 1996) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594 (LAP), 1996 WL 88570, at *5 (S.D.N.Y. Feb. 29, 1996)).

14

personal way from the purported fraud."[49]  Motives common to most corporate officers, however, are insufficient.[50]

If plaintiffs have not sufficiently alleged motive and opportunity, they may rely upon allegations of strong circumstantial evidence, "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."[51]  A complaint sufficiently alleges strong circumstantial evidence of *scienter* when it alleges that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor."[52]

## II.     Securities Act Claims

The CFAC asserts Section 11 claims against individual defendants Fuld, Akers, Berlind, Kaufman, Evans, O'Meara, Hernandez and Callan, as well as Ernst & Young, based upon allegedly false and misleading statements in Lehman's financial statements that were incorporated into the Offering Documents.[53]  It asserts Section 15 claims against Officer Defendants Fuld,

---

[49]

      *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase* Co., 553 F.3d 187, 198 (2d Cir. 2009) ("*ECA*") (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000)).

[50]

      *Id.*; *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

[51]

      *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142).

[52]

      *Id.*; *Novak*, 216 F.3d at 311; *see Teamsters Local 445 Freight Divi. Pension Fund*, 531 F.3d 190, 194 (2d Cir 2008).

[53]

      CFAC ¶¶ 454-65.

O'Meara, Callan and Lowitt on the theory that they allegedly controlled Lehman, which is alleged to have been a primary violator of Section 11.[54]  Defendants argue that these claims are untimely and that the CFAC does not sufficiently state a claim for relief.

### A.      Timeliness

Section 13 of the Securities Act provides that "[i]n no event shall any . . . action be created under [Section 11] . . . more than three years after the security was bona fide offered to the public."[55]  As this Court has noted, the three year statute of repose set forth in Section 13 provides an "absolute" limit.[56]

Defendants challenge on Section 13 grounds the timeliness of plaintiffs' claims with respect to eleven of their purchases.[57]  Plaintiffs concede that the claims based on eight of them are untimely.[58]  They disagree as to whether three of the purchases made by plaintiffs Burbank, Monterey, and Contra Costa[59] – which occurred on May 9, 2006, October 1, 2007, and February 5,

---

[54]
    *Id.* ¶¶ 466-70.

[55]
    15 U.S.C. § 77m.

[56]
    *In re Lehman Bros. Sec. and ERISA Litig.,* 800 F. Supp.2d 477, 482 (S.D.N.Y. 2011) (hereinafter *"MBS I"*).

[57]
    Ind. Defs.' Mem. [DI 640] 3-7 (defendants challenge timeliness under § 13 of eleven of 21 purchases).

[58]
    Pl. Mem. [DI 715] 18 n.20 & Appx. B.

[59]
    These are CUSIP No. 52517PG96, purchased by Burbank on May 9, 2006, CUSIP No. 52517PG21, purchased by Monterey on October 1, 2007, and CUSIP No. 52517PR60, purchased by Contra Costa on February 5, 2008.  *See* CAC App. B.

16

2008 – are barred by the statute of repose.  The pivotal question is whether the plaintiffs have alleged facts from which it reasonably might be inferred that these three purchases occurred less than three years after each of the securities involved "was bona fide offered to the public."

The starting point for this analysis the Second Circuit's observation that "ordinarily, a security is 'bona fide offered to the public' at the effective date of the registration date."[60]  To be sure, the phrase "bona fide offered to the public" recognizes that there will be circumstances in which stock covered by an effective registration statement has not genuinely been offered to the public, in which case the commencement of the repose period may begin later than the effective date of the registration statement.[61]  But the period otherwise normally begins to run "when the security is *first* bona fide offered."[62]

It is undisputed that the registration statements for these three securities became effective on May 18, 2005, May 18, 2005, and May 30, 2006, respectively.[63]  The CFAC does not allege that the securities thus registered were not genuinely available on those dates.  The repose period for each therefore began on the effective date of its registration statement, which in each case antedated the filing of the purchaser's complaint by more than three years.

Plaintiffs nevertheless contend that the issuer in each case filed a post-effective pricing supplement to the registration statement.  They suggest that the repose periods began to run

---

[60]

      *Finkel v. Stratton Corp.,* 962 F.2d 169, 174 (2d Cir. 1992).

[61]

      *P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 99-100 (2d Cir. 2004) (emphasis in original).

[62]

      *Id.* at 100-06.

[63]

      Def. Mem. [DI 640] at 5-6 & nn. 8-10; *see* Wasserman Decl. [DI 639] Ex. D, G, F, respectively; Edling Decl. [DI 717] Ex. 3, 7, 5, respectively.

17

from the dates of those supplements, citing *Finkel v. Stratton Corp.*[64]  But *Finkel* discussed only resetting the repose clock by virtue of prospectus amendments pursuant to 17 C.F.R. § 229.512(a)(1)(ii), which is not the situation here.  Nor do plaintiffs point to any authority supporting their claim that the clock is reset by the filing of pricing supplements, which would be at odds with *P. Stolz Family P'ship v. Daum.*[65]  Accordingly, (1) all Securities Act claims of plaintiffs City of Auburn, Contra Costa Water District, Mary A. Zeeb, Monterey County Treasurer, and Zenith, and (2) the Securities Act claims of the City of Burbank, San Mateo County, and the Vallejo Sanitation & Flood District with respect to the securities bearing CUSIP numbers 52517PG96, 52517PXU0, 52517PC58, 52517PYN5, and 52517PXT3, are dismissed

>    B.    *The Sufficiency of the Remaining Section 11 Claims*

This leaves Securities Act claims by four plaintiffs[66] with respect to ten remaining purchases of six different Lehman securities.[67]

>    1.    *Legal Standards*

Section 11 claims impose a "stringent standard of liability" that "places a relatively

---

[64]
>    Pl. Mem. [DI 715] 17-18 & n.19 (citing *Finkel,* 962 F.2d at 174); Edling Decl. [DI 717] Exs. 3-8

[65]
>    355 F.3d 92.

[66]
>    City of Burbank, City of San Buenaventura, San Mateo County, and Vallejo Sanitation & Flood District.

[67]
>    The securities bear CUSIP numbers 5252M0BZ9, 52517PK83, 52517PN98, 52517PQ46, 52517PW31, and 52517P2K6.

18

minimal burden on a plaintiff."[68]  A plaintiff bringing a Section 11 claim must allege that:

> "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"[69]

Only five categories of persons may be held liable under Section 11[70] – issuers, those who have signed a registration statement, an issuer's directors, "experts" who have consented to having their reports included in the registration statement, and underwriters of the offered securities.[71]

### 2.    *The Present Case*

The CFAC alleges Section 11 claims against individual defendants Fuld, Akers, Berlind, Daufman, Evans, O'Meara, Hernandez, and Callan, (the "Securities Act Defendants") and Ernst & Young.  The Securities Act Defendants challenge Plaintiffs' claims primarily on the grounds  that plaintiffs (1) allege misstatements or omissions previously dismissed in *E/D Class Action I*, and (2) purchased many of the offerings before the alleged occurrence of certain misstatements and omissions and thus could not have been injured by them..

---

[68]

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

[69]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

[70]

15 U.S.C. § 77k(a).

[71]

*Id.*

       *a.*     *Alleged Misstatements and Omissions Dismissed in the E/D Class Action*

The CFAC alleges that Lehman's financial statements and Offering Documents, as well as certain other statements, were materially misleading in that they

- Materially understated its net leverage by their use and accounting for Repo 105 transactions including their accounting for the transactions as sales rather than financings in alleged violation of SFAS 140.[72]

- Overstated the value of Lehman real estate assets, notably that of Archstone,[73]

- Failed adequately to disclose its liquidity, including by (a) omitting to disclose the liquidity impact of Repo 105 transactions as allegedly required by Item 303 of Regulation S-K, and (b) including in Lehman's reported liquidity pool encumbered or illiquid assets,[74]

- Misled as to Lehman's risk management practices including by (a) misleading as to compliance with concentration, balance sheet, and value-at-risk ("VaR") limits, and (b) excluding risky principal investments from stress testing,[75]

- Failed properly to disclose concentrations of risk in Alt-A loans and commercial real estate,[76] and

- Misrepresented the conformity of Lehman's financial statements with generally accepted accounting principles ("GAAP") with respect to the accounting for Repo 105 transactions and alleged failure to comply with

---

[72]

      CFAC ¶¶ 187-210, *see also id.* 373-73.

[73]

      *Id.* ¶¶ 236-42, 384-94.

[74]

      *Id.* ¶¶ 252-62, 395-408.

[75]

      *Id.* ¶¶ 274-88, 409-20.

[76]

      *Id.* ¶¶ 297-307, 421-25.

SFAS 157 and Item 303 of Regulation S-K.[77]

These allegations substantially mirror the TAC's allegations of false and misleading statements and omissions in the *E/D Class Action*.[78]  The Court there:

- Dealt with the claims relating to the Repo 105 transactions by (a) dismissing as insufficient allegations that Lehman's financial statements improperly accounted for the Repo 105 transactions as sales rather than financings under SFAS 140 but (b) upheld the sufficiency of the other Repo 105-related allegations.[79]

- Dismissed as insufficient the allegations concerning Lehman's statements that it ensured that appropriate risk mitigants were in place but sustained the sufficiency of the allegations that Lehman exceeded its risk limits, stated that it used stress testing to evaluate risks associated with its real estate portfolio and exceeded its stated VaR limits.[80]

- Dismissed as insufficient the allegations of alleged misstatements and omissions related to liquidity.[81]

- Dismissed as insufficient allegations concerning the concentration of risk in Lehman's leveraged loans; that Lehman failed adequately to disclose significant concentrations of credit risk in its Alt-A holdings prior to February 20, 2008; and that Lehman failed adequately to disclose significant concentrations of credit risk in commercial real estate holdings based on statements in Offering Materials other than Lehman's 2007 Report on Form 10-K.  But it sustained the sufficiency of the allegations that Lehman, in violation of SFAS 107, failed adequately to disclose significant concentrations of credit risk in its Alt-A holdings in pertinent documents for offerings after February 20, 2008, and in its commercial real estate holdings

---

[77]

Id. ¶¶ 309-30, *see also* ¶¶ 372-83.

[78]

*See* DI 640, at 8 n.15 (laying out similar allegations in CFAC and *E/D* TAC)

[79]

Pretrial Order No. 19 [DI 456], at ¶¶ 4-7.

[80]

Id. ¶¶ 8-9.

[81]

Id. ¶ 10.

in its 2007 Report on Form 10-K.[82]

- Dismissed as insufficient the allegations regarding Lehman's valuation of its commercial real estate assets.[83]

Thus, the ruling in *E/D Class Action I* appears at first blush to be substantially dispositive of the parties' contentions with respect to the sufficiency of the CFAC's allegations of false and misleading statements and omissions.  Plaintiffs, however, contend that the allegations of the CFAC have improved upon those at issue in the *E/D Class Action* to an extent that they now are sufficient on several points and that the Court should resolve favorably to them an issue that it did not reach in *E/D Class Action I,* viz. "whether Item 303 of Regulation S-K . . . required disclosure" of the Repo 105 transactions.[84]  The Court begins with the Item 303 issue and then proceeds to the alleged improvements in the allegations of this complaint as compared to the TAC.

### i.    *Regulation S-K Item 303*

The Court declined in *E/D Class Action I* to decide whether Item 303 of Regulation S-K required the disclosure of the Repo 105 transactions because that disclosure, assuming the truth of the allegations of the TAC, was required independently of Item 303, because Lehman's statements regarding its net leverage otherwise were materially misleading.[85]  There is no need to decide the Item 303 question now for precisely the same reason.  The Court therefore declines to

---

[82]

    *Id.* ¶¶ 11-15.

[83]

    *Id.* ¶ 16.

[84]

    *E/D Class Action I,* 799 F. Supp. 2d at 283.

[85]

    *Id.*

22

do so.

<div align="center">

ii.    *SFAS 140 and Repo 105 transactions*

</div>

Plaintiffs, with a certain degree of understatement, agree that the CFAC's "allegations related to Repo 105 transactions, and the failure to comply with SFAS 140, are largely aligned with the Class complaint,"[86] which the Court found insufficient in that respect. But they assert that CFAC now alleges that the Repo 105 transactions improperly were treated as sales because Lehman maintained control over the assets it received in an amount that was "equivalent to the amount of securities pledged as collateral."[87] This, they contend, is sufficient.

As this Court already has noted

> "SFAS 140 contains 'standards for accounting for securitizations and other transfers of financial assets and collateral.'[88] Under SFAS 140, whether a transferred asset properly is accounted for as a sale or a financing is dependent on the degree of control that the transferor has over the asset. If the transferor retains control . . . over the asset, it should recognize the asset on its balance sheet. If the transferor surrenders control, 'those assets shall be accounted for as a sale.'"[89]

A "transferor has surrendered control . . . if and only if *all of [three] conditions* are met,[90] among them that the "transferor [not] maintain effective control over the transferred assets through . . . an agreement that both entitles and obligates the transferor to repurchase" them.[91] But, as the Court

---

[86]    DI 715, at 13.

[87]    CFAC ¶¶ 317-21.

[88]    SFAS 140, ¶ 9 (emphasis in original).

[89]    *E/D Class Action I*, 799 F. Supp. 2d at 277 (citing SFAS 140, at 4, ¶¶ 5, 9).

[90]    SFAS 140 ¶ 9.

[91]    *Id.* ¶ 9(c).

wrote previously:

> "A transferor maintains effective control over an asset pursuant to such an agreement only if, *inter alia,* 'the transferor is able to repurchase [the assets] on substantially the agreed terms, even in the event of default by the transferee.' *This occurs only if 'at all times during the contract term [the transferor] ha[s] obtained cash or other collateral sufficient to fund substantially all of the cost of purchasing replacement assets from others.'"*[92]

The Court dismissed the allegations of alleged non-compliance with SFAS 140 in the TAC in the *E/D Class Action* because those plaintiffs had "fail[ed] to allege that Lehman obtained funds in the Repo 105 transactions sufficient to replace the transferred assets from others." The plaintiffs here have sought to remedy that flaw by alleging that, while Lehman received $100 in cash for every "sale" of $105 in securities in a Repo 105 transaction, it did not account for the "5% haircut on the sale" as a loss, booking the $5 as a "derivative asset" instead.[93]  Therefore, plaintiffs assert, the $100 in cash Lehman received plus its bookkeeping entry of a $5 derivative asset in each such transaction totaled "exactly the same amount of collateral that Lehman transferred in a Repo 105 transaction."[94]  They argue that Lehman therefore received funds in each Repo 105 transaction sufficient to replace the transferred assets from others and thus retained control of the transferred assets.[95]

This contention is readily answered.    As the Examiner's Report, which is

---

[92]

*E/D Class Action I,* 799 F. Supp.2d at 278 (quoting SFAS ¶¶ 48(b), 49) (footnotes omitted) (emphasis added).

[93]

*See* DI 715, at 13-14; CFAC ¶¶ 317-19.

[94]

DI 715, at 14; CFAC ¶ 319.

[95]

DI 714, at 14; CFAC ¶ 319.

incorporated by reference in the CFAC on this point,[96] made clear, the $5 derivative asset that Lehman booked represented "the market value of the 'overcollateralization' amount of the transaction."[97]  While that overcollateralization presumably had value sufficient to justify booking it as an asset, the question remains whether it, together with the $100 of cash that Lehman received in each Repo 105 transaction, constituted, in the words of SFAS 140, "cash or other collateral sufficient to *fund* . . . the cost of purchasing replacement assets."[98]  But the $5 certainly was not cash. Nor is there anything in the CFAC or in plaintiffs' papers to support a conclusion that it was collateral or that its internal book entry could have been used to buy anything.  The simple fact of the matter is that Lehman received $100 for each $105 in assets it transferred, which was not sufficient to "fund" the purchase of a "replacement" asset.  As Lehman therefore did not relinquish control within the meaning of SFAS 140, it was not obligated by that Standard to report the Repo 105 transactions as sales.  Plaintiffs' claims as to violations of SFAS 140 resulting from Repo 105 transactions therefore are dismissed for substantially the same reasons as were the corresponding allegations in the *E/D Class Action.*[99]

### iii.  Valuation of Real Estate and SFAS 157

Both the *E/D Class Action* TAC and the CFAC allege that Lehman overstated the

---

[96]  *See id.* (citing ER, at 781-82).

[97]  ER, at 781-82.

[98]  SFAS 140, ¶ 49 (emphasis added).

[99]  *Id.* at 278-79.

value of real estate assets because its valuation models failed to comply with SFAS 157.[100] The Court dismissed those allegations in the *E/D Class Action* on the ground that valuations are matters of judgment and, because the TAC failed to allege that "Lehman had not truly believed that the models, assumptions and inputs . . . produce[d] fair values in accordance with SFAS 157," it did not adequately allege that Lehman's judgments as to value were false and misleading.[101]

        The CFAC attempts to plug this hole principally by asserting that some of the relevant assets were "valued using outdated and inaccurate pricing models that Lehman employees described as 'worthless'."[102]   In fact, however, this assertion is inaccurate in that the quoted language, which comes from the Examiner's Report, (1) described one comment about a particular valuation method, and (2) was attributed not to a Lehman employee, but to an outside consultant.[103] But putting all that aside, and taking it in context, the Examiner's fundamental points – which were considerably more nuanced than the use that plaintiffs' would make of their inaccurate reference to a snippet contained in his discussion – were two:

        •        Lehman realized in late 2007 that the CAP *105 model it used as *part* of the PTG valuation process – which was a "prudent approach [in] an up market"[104] – was no longer an "appropriate methodology."[105] Lehman thus "began to enact a plan to change . . . the reporting system," which included

---

[100]

        *E.g.,.*Pl. Mem. [DI 715] at 14 (citing CFAC ¶¶ 236-51).

[101]

        *E/D Class Action I,* 799 F. Supp.2d at 312.

[102]

        CFAC ¶ 238 (quoting ER, at 317)

[103]

        ER, at 317 & n.1158.

[104]

        *Id.* at 314.

[105]

        *Id.* at 313.

replacing Cap * 105.[106]  However, recognizing repeatedly that valuation of assets such as these are matters of judgment and that there is a wide range of reasonable valuations for a given asset, " Lehman was unable quickly to replace Cap * 105 with a valuation methodology that employed market based yields."[107]

- There was not "sufficient evidence that Lehman's failure to employ appropriate yields for PTG assets during the second and third quarter of 2008 supports a finding that any Lehman officers breached their fiduciary duties. Although there is sufficient evidence to demonstrate that the valuation methodology for PTG assets did not rely on market based assumptions, there is insufficient evidence to demonstrate that any Lehman officer acted with an intent to produce incorrect values or conducted the valuation process in a reckless manner. While Lehman's staffing was inadequate to comprehensively value or test the significant number of positions in the PTG portfolio, and there was also questionable judgment in the selection of yields, the valuation determined by Lehman did not result from actions (or omissions) that would support a claim of a breach of fiduciary duty."[108]

In short, the CFAC, like the TAC in the *E/D Class Action,* fails to allege that Lehman believed that the valuations used in its financial and other statements were unreasonable or that its financial statements did not comply with SFAS 157.  Plaintiffs' claims based on Lehman's alleged violation of SFAS 157 are dismissed for substantially the reasons set forth in the *E/D Class Action I* opinion.[109]

---

[106]
    *Id.* at 314.

[107]
    *Id.* at 329.

[108]
    *Id.* at 330.

[109]
    *E/D Class Action I*, 799 F. Supp. 2d 311-13.

*b. Viability in this Case of Alleged Misstatements and Omissions Upheld as Sufficient in the E/D Class Action*

The remainder of the plaintiffs' Section 11 allegations are similar to claims made in the *Equity/Debt Class Action.* But the defendants argue that there is an added complication here – this case rests in significant part on securities purchases made prior to the alleged misstatements and omissions. Accordingly, they contend, the claims based upon alleged misstatements and omissions, even those alleged sufficiently, must be dismissed because there is can be no logical connection between the purchases and the subsequent disclosure failures. We discuss these in turn.

*i. SFAS 107 and credit risk in Alt-A holdings*

First, the Court previously held sufficient the allegation that Lehman failed adequately to disclose concentrations of credit risk in its Alt-A holdings in violation of SFAS 107, but only as to SEC filings made after February 20, 2008, the first of which was an April 8, 2008 Form 10-Q.[110] Plaintiffs do not dispute this holding or suggest that there is anything new in the CFAC that would alter it.

The last of plaintiffs' alleged purchases in this case was made on March 31, 2008,[111] nine days before the first of the allegedly misleading statements regarding concentrations of credit risk in Lehman's Alt-A holdings.[112] Accordingly, the claims based on alleged failure adequately to

110 *E/D Class Action I*, 799 F. Supp.2d at 291-292.

111 This was the March 31, 2008 purchase by Auburn of securities with CUSIP No. 52517PSC6. Auburn's claim in any case is time barred under Securities Act § 13. The latest purchase made by a plaintiff the claim of which is not barred by § 13 was San Mateo's February 15, 2008 purchase of securities with CUSIP No. 52517PK83.

112 *See E/D Class Action I*, 799 F. Supp. 2d at 291.

disclose concentrations of credit risk in Alt-A holdings in violation of SFAS 107 are dismissed.

ii.      *SFAS 107 and credit risk in commercial real estate holdings*

The situation is similar with respect to allegations that Lehman failed adequately to disclose concentrations of credit risk with respect to commercial real estate holdings ("CRE"). The Court in *E/D Class Action* held that the TAC sufficiently alleged that Lehman believed that it had significant concentrations of credit risk in CRE from and after November 2007 and, in consequence, that there was a sufficient Section 11 claim on this basis "only with respect to the alleged omissions [on this subject] in the 2007 10-K, issued in December 2007."[113] The Section 11 claims with respect to disclosure of concentrations of credit risk in CRE in prior periods and periods subsequent to Lehman's disclosure of that risk in its 1Q2008 Form 10-Q on April 8, 2008 were dismissed.

Plaintiffs here challenge neither that ruling nor its applicability to the CFAC. Accordingly, the Section 11 claims based on the alleged faulty disclosure with respect to concentration of credit risk in CRE, save with respect to the five purchases made during the time period between Lehman's awareness of the concentration and April 8, 2008, are dismissed.[114]

---

[113]

*Id.* at 291-92.

Plaintiffs there conceded that Lehman adequately disclosed the amounts and locations of its CRE holdings beginning with its Report on Form 10-Q for the first quarter of 2008, *id.* at 292, which was filed on April 8, 2008.

[114]

The five relevant purchases during that period were are Burbank's purchase on January 29, 2008 of CUSIP No. 525M0BZ9, Vallejo's purchase on January 30, 2008 of CUSIP No. 525M0BZ9, Contra Costa's purchase on February 5, 2008 of CUSIP No. 52517PR60, Ventura's purchase on February 5, 2008 of CUSIP No. 5252M0BZ9, and San Mateo's purchase on February 15, 2008 of CUSIP No. 52517PK83. Auburn's claim with respect to its March 31, 2008 purchase of CUSIP No. 52517PSC6 is barred by Securities Act § 13 as previously discussed.

### iii.    Materiality of Repo 105 transactions

The CFAC claims that defendants are liable for misstatements and omissions relating to the Repo 105 transactions for the period 2001 through 2008, asserting that Lehman used the Repo 105 transactions throughout that period in a "material" way without adequate disclosure.[115]  Many of the defendants counter that claims based on material misstatements or omissions with respect to Repo 105 transactions cannot succeed for purchases made before January 29, 2008, the date on which Lehman filed its 2007 Form 10-K.  This argument is an attempt to spin gold out of straw.

Defendants' position rests on the fact that the Examiner's Report concluded that a trier of fact could find that Repo 105 transactions were used to create a materially misleading picture of Lehman's financial condition beginning in late 2007.[116]  Even giving the movants the benefit of the implication that the Examiner believed that this had not been so earlier, however, this attempt to seek dismissal of this aspect of the CFAC on the basis of the Examiner's Report would be fundamentally flawed.

As previously indicated, the Court assumes that plaintiffs made sufficient use of the Examiner's Report in the CFAC to regard it as incorporated by reference for purposes of this motion.  Hence, it properly is considered, where appropriate, for the proposition that the statements it contains in fact were made by the Examiner.  But that is quite a different matter from the propriety of its being considered for the truth of the statements it contains, let alone for accuracy of the opinions expressed by the examiner.  The Court declines to limit the time period with respect to which plaintiffs may seek relief for the alleged failure to disclose the Repo 105 transactions on the

---

[115] See CFAC ¶¶ 210 n.5, 214-15, 316, 373.

[116] ER, at 732-34, 740, 746-50.

basis of the Examiner's opinion, assuming *arguendo* that he in fact held such an opinion, that the nondisclosure was not material prior to the end of 2007.  This aspect of the motion is denied.

### iv.    Risk limits

Like the plaintiffs in *E/D Class Action,* plaintiffs here allege that Lehman regularly exceeded its purported risk limits and that its statements on the subject therefore were misleading. The Court sustained the sufficiency of that claim in *E/D Class Action* in light of the TAC's allegation that Lehman had exceeded those limits every month from July 2007 to February 2008.[117] The CFAC makes substantially the same allegation.

Many of the movants argue that any claim that the statements regarding purported limits were misleading prior to July 2007 should be dismissed, as there are no allegations in the CFAC to support it.  Plaintiffs do not even address the argument.  Accordingly, any claim that Lehman's statements prior to July 2007 regarding its purported risk limits, if plaintiffs indeed even make such a claim, is dismissed.

### v.    Stress Tests

Lehman's Offering Materials stated that it used stress testing to evaluate risks associated with [its] real estate portfolios.  Both the TAC in the *E/D Class Action* and the CFAC here allege that these statements were materially misleading because Lehman failed to disclose that it excluded many of its most risky principal investments from stress testing.[118]  In this case, however,

---

[117]    *E/D Class Action I,* 799 F. Supp.2d at 284-85.

[118]    *Id.* at 285-86; CFAC ¶¶ 285-86.

the allegation is only that Lehman excluded those investments from its stress testing "in the first half of 2007."[119]  Movants therefore argue that claims with respect to purchases of securities made prior to February 13, 2007, the first date in 2007 when Lehman filed a document with the SEC, should be dismissed because the CFAC alleges no disclosure irregularity on this subject in relation to earlier purchases.

Again, plaintiffs do not respond to the argument, which is entirely sensible. Consequently, claims based on the alleged disclosure irregularities concerning stress testing made in relation to securities purchases prior to February 13, 2007 are dismissed.

### vi.    VaR limits

As noted elsewhere, VaR is an acronym for Value-at-Risk, which is a statistical measure of the potential loss in the fair value of a portfolio due to adverse movement in underlying risk factors.[120]  The TAC in *E/D Class Action I* and the CFAC here allege that Lehman's statements regarding its VaR were false and misleading because both the firm and three of its business lines routinely exceeded the stated limits.  The Court upheld the sufficiency of these allegations in *E/D Class Action I,* noting that the TAC breached its firm-wide VaR limit on 44 occasions during the class period and that the pleading alleged routine breaches in the three business lines, especially in view of a suggestion in Lehman's 2007 Form 10-K that breaches of VaR were infrequent.[121]

Certain defendants now contend that claims based on the allegedly misleading

---

[119]

   *Id.* ¶ 285.

[120]

   *E/D Class Action I,* 799 F. Supp.2d at 286.

[121]

   *Id.* at 286-87.

32

disclosure concerning use of VaR limits should be dismissed with respect to securities purchases made before October 1, 2007 because the CFAC alleges that the departures from the firm-wade VaR limit occurred 44 times from mid-2007 through September 15, 2008 and those with respect to two of the business lines allegedly occurred only in the period no longer than mid-2007 through September 15, 2008.[122]  Again, plaintiffs do not respond to the point.

Certainly plaintiffs who purchased their securities before the alleged misleading statements were made have no claim.  Accordingly, claims based on purchases of securities made prior to mid-2007, the earliest date on which the CFAC alleges that the VaR statements were misleading, are dismissed.  For present purposes, that date is fixed at July 1, 2007.

c.    *Section 11 Claims against Callan*

As in the  *E/D Class Action*, claims as to Callan may stand only "to the extent that the[y are] based on statements made in the SEC filings that she signed [as chief financial officer] and that were incorporated by reference in [the 2006 Registration] Statement."[123]

Callan now argues that purchases made by plaintiffs here between December 1, 2007, when she became chief financial officer, and January 29, 2008, when Lehman's 2007 10-K was

---

[122]

They argue also that all of these claims should be dismissed on the alternate ground that Lehman's statement was only that it monitored VaR and that there is no suggestion that it did not do so.  The argument is baseless.  A trier of fact readily could infer that the statement implied and likely was understood to mean that VaR was monitored in order to ensure compliance with the VaR limits and that the failure to disclose that those limits frequently were exceeded rendered the statement that was made misleading.

[123]

*E/D Class Action I*, 799 F. Supp.2d at 316.

filed, and which she is alleged to have signed, fail to state a claim under Section 11.  She asserts[124] that the CFAC alleges no specific misstatements during this time made either by her or in Lehman SEC filings that she signed.[125]

Plaintiffs respond that Callan signed Lehman's December 13, 2007 Form 8-K, which they assert "detailed Lehman's quarterly earnings for the fourth quarter of 2007"[126] and that this document contained alleged misrepresentations that the Court has held to be legally sufficient in the preceding discussion, "including representations of net leverage rendered misleading by Repo 105 transactions."[127]   As will appear, this Form 8-K is alleged to have been incorporated into the Offering Documents for one relevant purchase.

The Court agrees that the CFAC sufficiently alleges that Callan signed the December 13, 2007 Form 8-K and that it contained material misstatements   It does not, however, allege any other such instances.  Accordingly, the Section 11 claims as to Callan are dismissed except to the extent that they are based on statements made during the relevant time period.[128]

---

[124]

Callan makes this argument in passing by reference to a similar but fact-dependent argument made in her memorandum in support of  the Individual Defendants' motion to dismiss in another case.  Ind. Defs.' Mem. [DI 640], at 13 (citing *State Compensation Insurance Fund v. Fuld et al.*, 11 Civ. 3892 (LAK), DI 588, at 7-8).

[125]

*See id.*

[126]

DI 715, at 17; *see also* Edling Decl. [DI 717], Ex. 2 (December 13, 2007 Form 8-K).

[127]

DI 715, at 17.

[128]

*See* CFAC ¶¶ 431-36 & Appx. A.  Three purchases allegedly were made between December 1, 2007 and January 29, 2008.  Claims based on two of those – the January 10, 2008 purchase made by Vallejo with CUSIP No. 52517PYN5, and the January 22, 2009 purchase made by Vallejo with CUSIP No. 52517PXT3 – however, are time barred by Securities Act § 13 as noted above.  Thus the only remaining purchase made during the relevant period

> d.       *Section 11 Claims against Ernst & Young*

Ernst & Young does not attack the sufficiency of the CFAC's alleged misstatements and omissions, but it does incorporate the other defendants' arguments that many of plaintiffs' Section 11 claims are barred by Section 13 of the Securities Act.  Plaintiffs offer no reason why the result should be any different in Ernst & Young's case.  Accordingly, the rulings on that issue apply to Ernst & Young as well.

In addition, Ernst & Young advances, again by reference, an argument made by certain underwriter defendants in a motion to dismiss *Washington State Investment Board v. Fuld*,[129] another case that is a part of the MDL.[130]  It argues that "plaintiffs first predicated their Section 11 claims on Repo 105 activity by Lehman . . . in amended complaints filed in August, September, and October, 2011 – more than three years [after] . . . any offering on which any of plaintiffs' Section 11 claims against EY is based. . . .   Consequently, insofar as the Section 11 claims against EY are predicated on Lehman's Repo 105 activity, these claims asserted in the [these] actions are barred by the applicable statute of repose."[131]  Plaintiffs do not address this argument.[132]

---

was that made by San Mateo on January 22, 2008, of securities bearing CUSIP No. 5252M0BZ9.

[129]

No. 09 Civ. 6041 (LAK).

[130]

*See* DI 456, at 23 (Underwriter defendants memorandum of law in support of their motion to dismiss plaintiffs' amended complaint in *Washington State Investment Board v. Fuld*, No. 09 Civ. 6041).

[131]

DI 624, at 5.

[132]

*See* DI 715, at 16 n.16 (noting just that "E&Y's only challenge to Plaintiffs' Section 11 claim was based on the Statute of Repose").

Under Ernst & Young's theory, no Section 11 "claim" first made by a party more than three years after a security is offered is timely under Section 13.[133]  Section 13, however, provides that no new "action" shall " be created under [Section 11] . . . more than three years after the security was bona fide offered to the public."[134]  Thus, the question really is whether plaintiffs' allegations regarding Repo 105, added for the first time to their respective 2011 amended complaints, constituted new "actions" barred by the statute of repose.

The original complaints filed by these plaintiffs all brought Section 11 claims against Ernst & Young based on alleged misstatements and omissions in the offering documents.  These misstatements and omissions all were alleged to have been made in the annual and quarterly statements that  "Lehman's financial statements fairly presented the Company's financial position . . . in accordance with GAAP."[135]  The original complaints therefore alleged that Ernst & Young had made material misstatements and omissions in violation of Section 11 because its audit opinions and reports were "clean" and stated that, in its view, Lehman's financial statements had been prepared "in accordance with . . . GAAP[136] when in reality "[b]ased upon its annual audit and quarterly reviews, E&Y knew or recklessly disregarded the true financial condition and exposure

---

[133]     DI 624, at 5.

[134]     15 U.S.C. § 77m.

[135]     *Zenith Ins. Co. v. Fuld et al.*, No. 08 civ. 5352, DI 1, ¶ 135  (N.D. Cal. filed Nov. 25, 2008).

[136]     *San Mateo Cty. Invest. Pool v. Fuld et al.*, No. 08 civ. 5353, DI 1, ¶ 137 (N.D. Cal. filed Nov. 25, 2008); *see also Zenith Ins. Co. v. Fuld et al.*, No. 08 civ. 5352, DI 1, ¶ 151  (N.D. Cal. filed Nov. 25, 2008).

of Lehman."[137]

Additionally, plaintiffs' original complaints contained allegations that Lehman "artificially inflate[d] the value of its bonds,"[138] "took inadequate writedowns,"[139] had an "inadequate internal control structure,"[140] and "was forced to account for many of [its] securitization deals as secured financings instead of sales."[141]

The Examiner's Report then was released in March 2010.  Plaintiffs in this and other cases in the MDL amended their complaints, at least in part to reflect the Examiner's findings regarding Lehman's financial and accounting practices during the relevant time period.  The amendments ultimately included, among other things, new allegations regarding the effect of Repo 105 transactions on net leverage and Lehman's failure accurately to report the transactions and their effect in accordance with GAAP. These same allegations now appear in the CFAC.[142]

As to Ernst & Young, the CFAC still alleges that "[f]ollowing each and every audit during the Relevant Period, E&Y issued an unqualified audit report on the annual financial

---

[137]

      *Zenith Ins. Co. v. Fuld et al.*, No. 08 civ.  5352, DI 1, ¶ 149  (N.D. Cal. filed Nov. 25, 2008).

[138]

      *City of Auburn v. Fuld et al.*, No. 09 civ. 875, DI 1, ¶ 2 (N.D. Cal. filed Feb. 27, 2009).

[139]

      *Zenith Ins. Co. v. Fuld et al.*, No. 08 civ. 5352, DI 1, ¶ 8  (N.D. Cal. filed Nov. 25, 2008); *see also City of Auburn v. Fuld et al.*, No. 09 civ. 875, DI 1, ¶ 117(N.D. Cal. filed Feb. 27, 2009) ("Defendants continued to withhold information about Lehman's gross writedowns.").

[140]

      *San Mateo Cty. Invest. Pool v. Fuld et al.*, No. 08 civ. 5353, DI 1, ¶ 152 (N.D. Cal. filed Nov. 25, 2008)

[141]

      *City of San Buenaventura v. Fuld et al.*, No. 09 civ. 877, DI 1, ¶ 104 (N.D. Cal. filed Feb. 27, 2009).

[142]

      CFAC ¶¶ 187-202, 315.

statements of Lehman. . . . [and] [t]hese audit reports were false."[143]  It further alleges that these "Audit Reports certified that Lehman's financial results were . . . prepared in accordance with GAAP."[144] but that "[t]hese reports were false and misleading because E&Y failed to comply with the applicable standards for audit review engagements."[145]  The CFAC asserts that because "E&Y had no reasonable basis to believe that material modifications should not have been made to Lehman's financial statements," it was aware or should have been aware that Lehman's financial statements were not in compliance with GAAP.[146]

          The fundamental allegations regarding Ernst & Young therefore have changed little between the original and the present complaints.  At their core, plaintiffs' Section 11 claims against Ernst & Young are now – and have always been – that the auditor certified that Lehman's financial reporting was in accordance with GAAP, even though it was or should have been aware that this was not true, because it in turn was aware of various accounting devices and financial mechanisms that Lehman was using to portray its condition as better than it actually was.

          Supplemental allegations identifying Repo 105 as one of the means Lehman used to accomplish this alleged misreporting and the misstatements that ensued therefore did not create a new "action" as to Ernst & Young.  They simply provide additional support for the Section 11 claims that plaintiffs have been asserting from the beginning.  Accordingly, plaintiffs' allegations

---

[143]

          *Id.* ¶ 3.

[144]

          *Id.* ¶¶ 365, 367.

[145]

          *Id.* ¶¶ 366, 368.

[146]

          *Id.* ¶¶ 366, 368.

38

based on Lehman's use of Repo 105 transactions, their effect on net leverage, their compliance with GAAP, and the alleged misstatements that Ernst & Young made to that effect, are not barred by the statute of repose.

C.      *Section 15 Claims*

Section 15 liability is derivative of liability under Sections 11 and 12,[147] creating liability for any person who "controls" a primary violator of Section 11 or Section 12 of the Securities Act.[148]  Absent a primary violation of Section 11 or 12 by another person, there can be no liability for a controlling person under Section 15.

Plaintiffs have asserted Section 15 claims only as to defendants Fuld, O'Meara, Callan, and Lowitt.[149]  These defendants argue that plaintiffs have not adequately pled that they controlled a primary violator of Section 11.  They base this peculiar contention on the assertion that neither Lehman nor LBI – the entities they are alleged to have controlled and that are alleged to have violated Sections 11 and 12 –  can be a "primary violator" here because neither "is . . . a defendant."[150]

---

[147]

Section 15 states: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under Sections 77k [Section 11] or 77l [Section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . ."  15 U.S.C. § 77o(a).

[148]

*Id.*

[149]

*See* CFAC, at 155.

[150]

*See* DI 640, at 21 (citing *In re WRT Energy Sec. Litig.*, Nos. 96 civ. 3610, 96 civ. 3611, 2005 WL 323729, at *13 (S.D.N.Y. Feb. 9, 2005)).

The kindest thing to be said about this argument is that it is entirely unsupported by the language of the statute or any persuasive authority.  Equally unfounded is their contention that only control persons who have signed a relevant Registration Statement may be held liable under Section 15.  To the extent that plaintiffs have asserted legally sufficient claims under Section 11 based on misstatements and omissions by Lehman or LBI, their Section 15 claims against these individual defendants are sufficient as well.

III.    *Exchange Act Claims*

We already have discussed earlier the pleading standards that govern and the elements of securities fraud claims.  Defendants' motions here challenge the sufficiency of the CFAC's allegations of two of these elements – that is, whether plaintiffs have adequately pled a material misrepresentation or omission of fact, and whether they have adequately pled *scienter*.

A.    *10b-5 Claim as to the Officer Defendants*[151]

Section 10(b) claims are alleged against all of the Officer Defendants.[152]

1.    *Existence of Materially False and Misleading Statements or Omissions*

The CFAC Exchange Act claims are based principally on the same categories of alleged misstatements and omissions in the Offering Documents discussed in the Securities Act

---

[151]    Ernst & Young does not challenge the Section 10(b) claim asserted against it.  The Court thus declines to dismiss this claim.

[152]    *See* CFAC, at 156.

section above.  The CFAC thus alleges misstatements and omissions sufficiently as to the Officer Defendants under the Exchange Act to the same extent that it does under the Securities Act.


        2.      *Scienter*

        a.      *Motive and Opportunity*

The CFAC does not allege that any of the Officer Defendants had a motive to commit the alleged fraud beyond saying that they had goals "'possessed by virtually all corporate insiders' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability."[153]  Thus, the Court's determination in *E/D Class Action I* that the TAC in that case:

> "fails to allege that any of the defendants had a motive to commit the alleged fraud and fails also to allege that any of them benefitted from the alleged misrepresentations and omissions in a concrete way.  Accordingly, it fails to allege *scienter* on a motive-and-opportunity basis."[154]

applies equally to the CFAC here.


        b.      *Circumstantial Evidence of Conscious Misbehavior or Recklessness*

Defendants challenge the sufficiency of most of the *scienter* allegations of the CFAC.  Their arguments focus on the allegations relating to (1) Repo 105, (2) concentrations of credit risk, (3)  valuation of CRE, (4) liquidity, and (5) GAAP.

---

[153]

      *South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308).

[154]

      *E/D Class Action I*, 799 F. Supp. 2d at 294 (citing *South Cherry*, 573 F.3d at 108 ("Motive . . . could be shown by pointing to 'the concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures . . . .'") (quoting *Shields*, 25 F.3d 1124, 1128 (2d Cir. 1994))).

i.      *Repo 105 Allegations*

In *E/D Class Action I*, this Court held that the TAC "allege[d] sufficient red flags to give rise to an inference of *scienter* with respect to the Repo 105 transactions for any [Officer] Defendant who, because of his or her corporate role, responsibilities, and actions, knew or recklessly did not know of the misleading nature of the financial reporting of [the Repo 105] transactions."[155] The CFAC in this case contains substantially the same allegations and thus, at least at first blush, would appear to be sufficient.  Nevertheless, attempting to make a virtue out of necessity, the Officer Defendants contend that new allegations, added by plaintiffs in an attempt to bolster their case against Ernst & Young, require a different result as to the Officer Defendants.

The starting point for this interesting argument is that the CFAC is said to contain "qualitatively different" allegations regarding E&Y's  knowledge and approval of Lehman's Repo 105 policy.  These new allegations are said to demonstrate "clear nonculpable explanations" for Lehman's alleged disclosure deficiencies.[156]  The CFAC alleges that "at the time Lehman first developed its internal policy for Repo 105 transactions, its expert outside auditor E&Y knew of, vetted and approved the policy."[157]  In consequence, the argument goes, "plaintiffs' allegations describing E&Y's approval of Lehman's use of Repo 105 transactions provide a strong competing nunculpable explanation for the asserted conduction and negate any inference of scienter that may

---

[155]

       *E/D Class Action I,* 799 F. Supp.2d at 294.

[156]

       *See* DI 640, at 14.

[157]

       *Id.*

be drawn individually against any of the Officer Defendants."[158]

Essentially the same argument was made and rejected in *E/D Class Action I*,[159] albeit without the benefit of the more detailed allegations with respect to Ernst & Young. But the new allegations add nothing material. As the Court wrote previously,

> "Defendants argue that the 'more compelling inference is that the[y] had an honest belief that the [Repo 105] transactions were legal, as well as accounted for and disclosed in accordance with GAAP, and were legitimate sales transactions for business units to obtain funding and stay within their balance sheet targets.' They point to the fact that E&Y knew about Lehman's Repo 105 transactions and approved of their use and the accounting for them, and to the fact that Linklaters provided a 'true sale at law' legal opinion, purportedly satisfying one of SFAS 140's requirements. They point also to the fact that the transactions were used by many of the firm's business units and that Lehman could have reduced its net leverage to the same extent by selling the collateral assets outright, but that Repo 105 was less costly.

> "The suggestions that defendants believed that the Repo 105 transactions were permissible in and of themselves and that the financial reporting for them, in and of itself, complied with GAAP does not address the core of plaintiffs' claims – that they were used to reduce temporarily and artificially Lehman's net leverage and paint a misleading picture of the company's financial position at the end of each quarter. The allegations that these transactions were used at the end of each reporting period, in amounts that increased as the economic crisis intensified, to affect a financial metric that allegedly was material to investors, credit rating agencies, and analysts support a strong inference that the Insider Defendants knew, or were reckless in not knowing, that use of the Repo 105 transactions and the manner in which they were accounted for painted a misleading picture of the company's finances."[160]

The Officer Defendants nevertheless rely on the new allegations, which simply elaborate on the prior allegation that "E&Y knew about Lehman's Repo 105 transactions and approved of their use

---

[158]       *Id.*

[159]       799 F. Supp.2d at 296.

[160]       *E/D Class Action I,* at 296.

and the accounting for them,"[161] and rely heavily on *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*[162] All to no avail.

*Tellabs* stands at least for the propositions that a court passing on a motion to dismiss a complaint such as this on *scienter* grounds (1) "must take into account plausible opposing inferences,"[163] (2) "[t]he strength of an inference cannot be decided in a vacuum,"[164] (3) "[t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?,"[165] and (4) the requisite strong inference of *scienter* is present "if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[166]

Here, the Officer Defendants argue essentially that they all acted without culpable intent because Ernst & Young "knew of, vetted and approved" Lehman's internal policy for Repo 105 transactions "at the time Lehman first developed" it.[167]  That, the Court assumes without deciding, would be a permissible inference.  But this complaint, like that at issue in *E/D Class Action I,* alleges that Lehman repeatedly engaged in billions of dollars of Repo 105 transactions to

---

[161]

    *Id.*

[162]

    551 U.S. 308 (2007).

[163]

    *Id.* at 323.

[164]

    *Id.*

[165]

    *Id.*

[166]

    *Id..*

[167]

    Ind. Defs' Mem. [DI 640] at 14.

manipulate the important net leverage ratio precisely for the purpose of understating the company's leverage and vulnerability on quarterly financial reports, only to reverse the transactions immediately after the reporting dates, all without disclosure and all without any proper business purpose other than presenting the company's finances in a better light than that in which they otherwise would have appeared. The amounts of these transactions increased quarter-by-quarter as Lehman's situation became more and more precarious. As detailed in *E/D Class Action I,* three of the five Officer Defendants were chief financial officers of Lehman and the other two were its chief executive and chief operating officers, and all allegedly were well aware of what was going on.[168] The best that can be said for the Officer Defendants in these circumstances is that Ernst & Young's knowing approval, if that is what ultimately is established, of Lehman's "window dressing" of its financial statements to manipulate its net leverage might give rise to an exculpatory inference that a jury would find persuasive. But a contrary inference would be cogent and at least as compelling – namely, that the Officer Defendants knew full well of the misleading effect of their failure to disclose the Repo 105 transactions, sought to have Lehman benefit from that deception, and intended to use Ernst & Young as a fig leaf if the house of cards came tumbling down, as indeed it did. The Court rejects the Office Defendants' argument on this point.[169]

---

[168]

> *E/D Class Action I,* 799 F. Supp.2d at 294-96.

[169]

> The Officer Defendants seek to reargue the conclusions previously reached as to the sufficiency of the *scienter* allegations as to each of them individually. The arguments all are unpersuasive on a motion to dismiss. It perhaps would be useful to give one example of the lengths to which these defendants have gone.
>
> Defendant Callan argues that the CFAC's allegation that Lehman employee Martin Kelly "expressed concerns" to her about the use of Repo 105 transactions presents a "more compelling inference that Kelly wanted to make sure that Callan, as the new chief financial officer without an accounting background, had a basic familiarity with accounting issues" than the culpable alternative, viz. that he expressed concern about the misleading effect of

### ii.    Concentrations of Credit Risk

Plaintiffs' opposition papers note that the Court previously determined that *scienter* had been pled sufficiently as to defendants Fuld and Gregory regarding concentrations of CRE credit risk.[170] This conclusion extended only as to the Executive Committee's November 6, 2007 meeting. Plaintiffs, however, argue that additional allegations in the CFAC now plead *scienter* adequately as to all of the Officer Defendants from 2006 onward.[171]   The cited allegations in the CFAC,[172] however, do not cure earlier noted deficiencies.

The only allegation that comes close to alleging *scienter* adequately is similar to one in the *E/D* TAC and relates to an email sent by the co-head of Lehman's global fixed income division that indicated concern with the concentration of RMBS and Alt-A investments and their

---

the practice. DI 640, at 16.  The argument, however, rests on a mischaracterization of the CFAC's allegation about the conversation.  The actual allegation reads as follows, "Martin Kelly . . . expressed concerns to Defendants Callan and Lowitt . . . about: (1) the large volume of Repo 105 transactions undertaken by Lehman; (2) the fact that Repo 105 volume spiked at quarter-end; (3) the technical accounting basis for Lehman recording such transactions as 'sales,'; (4) the fact that Lehman's peers did not do Repo 105-style transactions; and (5) the reputational risk Lehman faced if its Repo 105 program were to be exposed." CFAC ¶ 230.  The more cogent and plausible inference from what is alleged in the CFAC, as opposed to the characterization in the Officer Defendants' memorandum, quite obviously is that Kelly made Callan quite aware of the dubious propriety and risks of accounting for the Repo 105 transactions as Lehman did without disclosing publicly what it was up to.

[170]

See DI 715, at 23; *see also E/D Class Action I*, 799 F. Supp. 2d at 297-98; DI 454 (pre trial order correcting portions of *E/D Class Action I*, and noting only Fuld and Gregory were adequately alleged to have had scienter as to this claim).

[171]

See DI 715, at 23.

[172]

CFAC ¶¶ 302-08.

potential effect on Lehman's balance sheet.[173]   The CFAC alleges, as the *E/D* TAC did not, that this email "indicates that . . . the Lehman Defendants" therefore were aware of these concentrations and the risk they presented.   But, as before, the allegations do not specify which of the Officer Defendants "received, saw, or otherwise knew of this email."[174]   Thus, "there are no allegations supporting an inference of *scienter* on the part of the [officer] defendants with respect to these alleged undisclosed concentrations of credit risk."[175]   Accordingly, the CFAC sufficiently alleges *scienter* as to these alleged misstatements and omissions only as to Fuld and Gregory and only with respect to the allegations regarding the November 6, 2007 Executive Committee meeting.[176]

### iii.      Valuation of CRE Assets

Defendants next contest plaintiffs' allegations that the officers each had *scienter* regarding Lehman's valuation of its CRE assets.   They argue that none of the allegations in the CFAC state that the Officer Defendants had "any role in valuing the identified commercial real estate assets, estimating or reporting assets under the SFAS 157 accounting framework or calculating the value of the Archstone investment for reporting purposes."[177]

In view of the Court's conclusion that the CFAC does adequately allege the existence

---

[173]

*Id.* ¶ 307.

[174]

*E/D Class Action I*, 799 F. Supp. 2d at 297-98.

[175]

*Id.* at 298

[176]

CFAC ¶ 305.

[177]

DI 640, at 18.

of any false statements or material omissions with respect to the valuation of Lehman's CRE assets,[178] it is not essential to reach the sufficiency of the plaintiffs' *scienter* allegations.  In the interest of avoiding any unnecessary remand in the event an appellate court should disagree, however, the Court reaches this alternative ground.

Assuming the existence of material misstatements or omissions as to the values of CRE assets, plaintiffs contend that an inference of recklessness on the part of the Officer Defendants may be drawn from the CFAC's allegations that values of certain assets "were overstated because they were not appropriately adjusted for risk, were based on faulty assumptions, or were not marked in accordance with Lehman's sales of same or similar assets."[179]  They assert that the size and relevance of the CRE business was sufficient to infer knowledge of these practices on the part of the Officer Defendants.

The CFAC alleges only that Lehman's CRE portfolio was overvalued and that Lehman eventually had difficulty finding a buyer.[180]  Even assuming that these allegations were sufficient, they would not be enough to give rise to an inference of *scienter* on the part of the Officer Defendants that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[181]

---

[178]

*See supra* Part 2(a)(iii).

[179]

CFAC ¶ 250.

[180]

Alleged statements from defendants Callan and Lowitt indicate only that they believed that the company was able to accurately value its CRE assets.  *See* CFAC ¶¶ 248-49.  They present no cogent inference that either of these defendants knew that these assets were not properly valued.

[181]

*Tellabs*, 551 U.S. at 324.

iv.        *GAAP Violations*

Defendants next argue that plaintiffs' Section 10(b) "scienter allegations as to GAAP violations should be rejected."[182]

It is not apparent that the CFAC makes such allegations.[183]  Nor do plaintiffs directly address defendants' arguments, noting instead that certain other allegations regarding Repo 105 transactions, risk management, and concentrations of credit risk all are alleged to have resulted in violations of GAAP and previously were held sufficient.[184]  Indeed, certain alleged misstatements regarding each of those claims were found actionable above, and in the *E/D Class Action I* opinion.

Plaintiffs argue that the fact that the Court held these alleged misstatements actionable and concluded that the CFAC sufficiently alleged that defendants acted with the requisite *scienter* as to these misstatements suffices to show that *scienter* is alleged adequately as to the GAAP violations.  It is true, as plaintiffs contend, that "[a]llegations of GAAP violations when taken collectively with other allegations [may] contribute to a strong inference of *scienter*."[185]  It does not follow, however, that plaintiffs have alleged *scienter* adequately as to the GAAP violations themselves.  Indeed, plaintiffs have failed to put forth any allegations that the Individual Defendants

---

182

    DI 640, at 19

183

    *See* CFAC ¶¶ 309-330 (alleging violations of GAAP resulted in material misstatements as to Repo 105, concentrations of credit risk, and risk management), ¶ 474 (alleging generally that the "Officer Defendants . . . had knowledge of the misrepresentations and omissions of material fact set forth herein").

184

    *See* DI 715, at 25; *E/D Class Action I*, 799 F. Supp. 2d at 294-98.

185

    DI 715, at 25.

acted with knowledge or recklessness as to the alleged GAAP violations. "[A]llegations that[Lehman's] financial reports violated GAAP . . . merely establish that the reports were false. They do not establish that the Individual Defendants issued those reports with the requisite fraudulent intent."[186]

Plaintiffs' allegations regarding violations of GAAP do not independently allege that any of the Officer Defendants knew about such violations, or knowingly or recklessly disregarded applicable GAAP standards.[187]  Thus, *scienter* has not been pled adequately as to this claim, to the extent it was ever alleged in the first instance.

*v.*      *Stress Tests*

Defendants assert that the CFAC does not sufficiently allege that any of the Officer Defendants acted with *scienter* with respect to the stress test-related allegations.[188]  Plaintiffs do not contest this.  Accordingly, the Section 10(b) claims against the Officer Defendants, insofar as the rest on allegedly misleading statements or omissions relating to stress tests, are dismissed.

*B.*      *Section 20(a) Claims*

---

[186]

       *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Only where . . . allegations [of GAAP violations] are coupled with evidence of corresponding fraudulent intent . . . might they be sufficient") (internal citation and quotation marks omitted).

[187]

       *See In re BISYS Sec. Litig.*, 297 F. Supp. 2d 430, 448 (S.D.N.Y. 2005).

[188]

       *See* DI 640, at 19; DI 792, at 4; *see also E/D Class Action I*, 799 F. Supp. 2d at 297 (dismissing claims regarding alleged *scienter* where O'Meara allegedly told the Examiner that Lehman "did not even start taking steps to include private equity transactions in its stress tests until 2008"); CFAC ¶ 292 (asserting *scienter* on basis of same statement);

50

To the extent that plaintiffs' Section 10(b) claims have failed to state a predicate violation of the Exchange Act, as discussed above, the Section 20(a) claims of course fail as well.[189] The Individual Defendants argue as well, however, that the remaining Section 20(a) claims asserted against them should be dismissed because plaintiffs have not alleged that they had the requisite control over a primary violator that is a named defendant.  As with plaintiffs' Securities Act Section 15 claims, discussed above, this argument is without merit.

The CFAC names also on the Exchange Act claims five individuals who were directors and are sued on a Section 20(a) theory.  They seek dismissal on the ground that the CFAC does not adequately allege that they were controlling persons, asserting on the basis of a single district court decision that "[d]irector status alone does not establish control person liability."[190] Assuming without deciding that this proposition is correct, however, it does not get the defendants to where they wish to go.

Control exists when a person has "the power [directly or indirectly] to direct or cause the direction of management and policies of a person, whether through ownership of voting securities or otherwise."[191]  Each of these five defendants allegedly sat on Lehman's Finance and Risk Committee.   They allegedly were "charged with, among other responsibilities, the responsibility to review and advise the Board of Directors on the financial policies and practices of the company . . . and ensuring the accuracy and completeness of applicable public filings they

---

[189]

*See* 15 U.S.C. § 78t.

[190]

DI 640, at 22 (quoting *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.,* 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (internal quotation marks omitted)).

[191]

17 C.F.R. § 240.12b-2.

signed."[192] These allegations could ground a reasonable inference that these defendants had the power to direct or cause the direction of management and polices of Lehman in the areas within the committee's remit.  Accordingly, the Court declines to dismiss the Section 20(a) claims against them.

IV.    *Common Law Claims*

     A.    *Governing Law*

Issues of state law in an action transferred pursuant to 28 U.S.C. § 1407, as here, are governed by the law of the state that would have been applied in the transferor forum.[193]   In this case, that is California unless otherwise noted.

     B.    *Fraud*

The elements of common law fraud are (1) a misstatement or an omission of material fact, (2) knowledge of falsity, (3) intent to defraud, (4) actual and justifiable reliance, and (5) damages.[194]  Plaintiffs assert common law fraud claims against the Officer Defendants and Ernst & Young.  The Officer Defendants, but not E&Y, move to dismiss them on the grounds that plaintiffs have not sufficiently pled reliance or *scienter*.

---

[192]
     CFAC ¶ 103.

[193]
     *See Belcher v. Eli Lilly & Co.*, 394 F. App'x 821, 822-23 & n.1 (2d Cir. 2010); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612)); *See* CFAC ¶ 505 (indicating same).

[194]
     *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004); *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).

There is no material difference between the *scienter* requirement under California law and the federal securities laws.   This Court's rulings on the adequacy of plaintiffs' *scienter* allegations thus control with respect to the common law fraud claims.   Defendants' attack on the common law fraud claims thus comes down to the sufficiency of plaintiffs' reliance allegations.

California law differs from federal securities law with respect to the element of reliance in three ways.   First, under California law, a plaintiff "must plead that he or she actually relied on the [alleged] misrepresentation."[195]   Second, California has rejected for common law fraud actions the presumption of reliance on material omissions that applies under *Affiliated Ute v. United States*[196] in Rule 10b-5 federal securities cases.[197]   In order to satisfy the reliance requirement with respect to an allegedly fraudulent omission, the plaintiff must plead or prove  that, "had the omitted information been disclosed, [he or she] would have been aware of it and behaved differently."[198]   Third, California, unlike the federal securities laws, recognizes a cause of action for fraud where the plaintiff was deceived into holding (rather than buying or selling) a security.[199]

Plaintiffs here sue as allegedly defrauded purchasers and holders.[200]  They rely both

---

[195]

    *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1089 (1993) (rejecting fraud-on-the-market presumption of reliance for common law fraud claims).

[196]

    406 U.S. 128 (1972).

[197]

    *Mirkin,* 5 Cal. 4th at 1093.

[198]

    *Id.*

[199]

    *Id.*

[200]

    *See* CFAC ¶¶ 7, 25, 35, 44, 52, 61, 71, 81, 89.

on alleged material omissions and alleged misstatements of fact.[201]  But their allegations of reliance – both as to their purchases of, and their forbearance from selling, their Lehman securities – are inadequate.

With respect to purchasers, each plaintiff alleges only that "[i]t is probable, if not certain, that [it] would not have purchased the subject Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents."[202]  Nowhere does any plaintiff allege, however, that it ever read any of the Offering Documents and relied on the alleged misrepresentations contained in those documents in making its decision to purchase Lehman securities, as is required to sustain a claim for fraud under California law.[203]  In consequence, plaintiffs' fraud claims with respect to purchases fail to state a claim.

The "holder" claims are deficient as well.  In California, a plaintiff bringing a holder claim "must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place.  The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and

---

[201]

Pl. Mem. (DI 715), at 27

[202]

CFAC ¶ 235, 251, 273, 296, 308.

[203]

See Murphy v. BDO Seidman, LLP, 113 Cal. App. 4th 687, 701, 6 Cal. Rptr. 3d 770, 781 (2003) (dismissing common law fraud claims as to plaintiffs who failed to allege that they had reviewed documents containing alleged misstatements and relied on them in making their decisions to purchase securities); Monaco v. Bear Stearns Companies, Inc., CV 09-05438 SJO JCX, 2011 WL 4059801, at *9 (C.D. Cal. Sept. 12,2011) (sustaining fraud claims only where plaintiffs allege that they had read and reviewed the relevant portions of the documents containing alleged misstatements).

54

decisions, that would indicate that the plaintiff actually relied on the misrepresentations."[204]  It is simply not sufficient for such a plaintiff to allege merely that the plaintiff "relied on defendants' misrepresentations" in its decision to refrain from selling its securities.[205]

Plaintiffs' reliance allegations are insufficient.  Their holder claims are based on the conclusory allegations that "[i]t is probable, if not certain, that [plaintiffs] would not have continued to hold the Lehman Securities absent the misrepresentations and concealment of information in the Offering Documents."[206]  Not only do they fail to allege that they actually read the offering documents and relied on them in their decisions to hold their Lehman securities, they fail also to set forth any facts showing how many shares they would have sold had they not relied on the alleged misrepresentations or omission, or when such sales would have taken place.[207]  These deficiencies doom plaintiffs' holder claims.

In sum, plaintiffs' allegations of reliance do not satisfy the requirements of California law.  The common law fraud claims against the Officer Defendants are dismissed as legally insufficient.

C.      Aiding and Abetting Fraud

The tenth claim for relief in the CFAC seeks recovery from the Officer Defendants,

---

[204]
   *Small v. Fritz Cos.,* 30 Cal.4th 167, 184 (2003).

[205]
   *Mirkin,* 5 Cal. 4th at 1093.

[206]
   CAC ¶¶ 7, 25, 35, 44, 52, 61, 71, 81, 89.

[207]
   *Small,* 30 Cal.4th at 184.

Ernst & Young, and the non-officer Lehman directors named as defendants here on a theory of aiding

and abetting the alleged common law fraud.  Each Officer Defendant is alleged to have aided and

abetted the fraud of each of the other Officer Defendants.[208]  The non-officer directors are alleged to

have aided and abetted the alleged fraud of the Officer Defendants by "intentionally allowing and/or

recklessly failing to detect or deter the Officer Defendants' misleading statements."[209]  Ernst &

Young is alleged to have aided and abetted "the fraud" by, *inter alia,* allowing Lehman's Repo 105

practice to continue.[210]  The Individual Defendants seek dismissal of this claim.

   California recognizes aiding and abetting liability where plaintiff establishes (1) a

primary fraud, and (2) the alleged aider and abettor's "actual knowledge" of and substantial

assistance to the successful consummation thereof.[211]  Absent a sufficient claim of a primary fraud,

a claim for aiding and abetting fraud must fail without regard to whether the remaining elements are

satisfied.[212]

---

[208]  CFAC ¶¶ 529-31.

[209]  *Id.* ¶ 532.

[210]  *Id.* ¶ 533.

[211]  *E.g., Facebook, Inc. v. MaxBounty, Inc.,* 274 F.R.D. 279, 285 (N.D. Cal. 2011).  There is
nothing unusual about this view, which is consistent with the widely held view.

[212]  *See Fortaleza v. PNC Fin. Services Grp,. Inc.*, 642 F. Supp. 2d 1012, 1027 (N.D. Cal. 2009)
(dismissing aiding and abetting claims where plaintiffs "fail to allege the specific grounds
for commission of any [underlying] tort); *Crown Paper Liquidating Trust v. Am. Int'l Grp.,
Inc.*, C-07-2308, 2007 WL 4207943, at *10 (N.D. Cal. Nov. 27, 2007) (dismissing claim
of aiding and abetting common law fraud where complaint failed to state a claim for
common law fraud); *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d
387, 396 (S.D.N.Y. 2010) (dismissing aiding and abetting claim where plaintiffs failed to
allege a primary violation).

Here, the aiding and abetting claims against the Individual Defendants – both the officers and the non-officer directors – rest on the assertions that the officers aided the fraud committed by other officers and that the non-officer directors aided the fraud committed by all of the officers.  But the CFAC does not adequately state a claim for fraud against any of the officer defendants.  Accordingly, the tenth claim for relief is dismissed as against all of the Individual Defendants.

D.  *Negligent Misrepresentation*

The eleventh claim for relief seeks recovery against all of the Individual Defendants for negligent misrepresentation for negligently inducing plaintiffs to purchase Lehman securities by means of false and misleading statements.[213]

The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) for the purpose of inducing reliance, (4) justifiable reliance, and (5) damages.[214]  The tort is essentially the same as common law fraud "with the exception that the defendant need not know that the representation is false."[215]

As discussed above, plaintiffs have not adequately pled reliance.  The eleventh claim for relief therefore is dismissed.

---

[213]

CFAC ¶¶ 539-40.

[214]

*See, e.g.*, *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407 (1992).

[215]

*Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 70 Cal. Rptr. 3d 199, 213 (Cal. App. 2007).

*V.      The Fraudulent Conveyance Claim*

The twelfth claim for relief attacks as fraudulent Richard Fuld's alleged November 2008 to his wife, Katherine Fuld, of a multi-million dollar Jupiter Island, Florida, residence for $100.[216]  The CFAC alleges that the transfer was made "with actual intent to hinder, delay and defraud investors, such as Plaintiffs, without receiving a reasonably equivalent value in exchange therefor, and [that] Mr. and Mrs. Fuld believed that they would incur debts beyond the Fuld's [*sic*] ability to pay as they came due."[217]  It thus rests upon Sections 4(a)(1) and 4(a)(2)(ii) of the Uniform Fraudulent Transfers Act, which has been enacted in both Connecticut, apparently the state of the Fulds' permanent residence, and Florida.[218]  The first of these provisions renders actionable transfers made with actual intent to defraud creditors.  The second applies to transfers for inadequate value where the transferor believed or reasonably should have believed that the transferor would incur debts beyond the transferor's ability to pay as they became due.

As an initial matter, the Fulds' motion entirely ignores the claim under Section 4(a)(2)(ii).  The allegations that the transfer was made (a) shortly after Lehman collapsed and filed for bankruptcy, (b) shortly after Mr. Fuld was fired without any bonus or severance, and (c) for virtually no consideration probably would have been sufficient even if they stood alone.  The

---

[216]

In fact, the CFAC is somewhat unclear about the transaction.  It alleges that the property was bought jointly by the Fulds in 2004, which suggests that the 2008 transfer perhaps was that of Mr. Fuld's interest in the property as opposed to the property itself.  But nothing turns on this for the present.

[217]

CFAC ¶ 549.

[218]

CONN. GEN. STAT. ANN. § 52-552(e); FL. STAT. ANN. § 726.105.

58

allegation that the Fulds at the time of the transfer believed that they would incur debts beyond their ability to pay would permit proof of the obvious – that Fuld was in imminent danger of incurring untold expenses either to defend himself, pay settlements, or satisfy judgments, or all three, in the avalanche of lawsuits that took no clairvoyance to foresee and probably had begun already.  Hence, the application to dismiss the Section 4(a)(1) claim is frivolous.

VI.     *California Corporations Code Claims*

    A.     *Sections 25400 and 25500*

        California Corporation Code Sections 25400(d) and 25500 (a) make it unlawful for a "broker-dealer" or "other person selling or offering for sale or purchasing or offering to purchase the security" to make a  "statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, for the purpose of inducing the purchase or sale of such security by others,"[219] and (b) create a private cause of action[220] against "[a]ny person who willfully participates in any act or transaction in violation of Section 25400," stating that such a person "shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction."

        Plaintiffs seek recovery under these statutes against the Individual Defendants on essentially the same bases as underlie their federal securities law and common law fraud claims.  The

---

[219]

       CAL. CORP. CODE § 25400(d).

[220]

       *See Kamen v. Lindly*, 94 Cal. App. 4th 197, 206 (Cal. Ct. App. 2001) ("Section 25400 defines the proscribed conduct, but does not create a private right of action that gives rise to civil liability.  Section 25500 creates the private right to action and establishes the circumstances under which a person who has engaged in the conduct proscribed by section 25044 may be held liable for damages.").

Individual Defendants seek dismissal of this claim on the grounds that (a) liability could attach here only if the plaintiffs and the defendants both dealt in exactly the same securities and, in any case, (b) the CFAC does not adequately allege the requisite willful intent.

### 1.    Type of Securities Bought and Sold

The basis of the first argument is that the only Lehman security in which the Individual Defendants allegedly dealt was Lehman common stock whereas the only Lehman securities in which the plaintiffs allegedly dealt all were various debt instruments.  They rely on the fact that Section 25400 prohibits only the making of a false or misleading statement by a person dealing in "the security" "for the purpose of inducing the purchase or sale of *such* security by others" to argue that the fact that the plaintiffs dealt only in Lehman debt while the Individual Defendants bought or sold only Lehman equity is fatal this statutory claim.

In determining California law, this Court is obliged to follow the judgment of a California intermediate appellate court "'unless it is convinced by other persuasive data that the highest court of the state would decided otherwise.'"[221]  In *McMahon v. Marsch & McLennan Cos.,*[222] the California Court of Appeal decided substantially the issue presented here.   The plaintiffs in that case sold put options against their holdings of Marsh & McLennan shares and sued defendants under

---

[221]
        *Comm'r of Internal Rev. v. Estate of Bosch,* 387 U.S. 456, 465 (1967) (judgment of intermediate appellate state court "'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'") (quoting *West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 237 (1940)); *see also West,* 311 U.S. at 236 (a federal court sitting in diversity "is not free to reject the state rule merely because it has not received the sanction of the highest state court").

[222]
        No. B216003, 2010 WL 2308437 (Cal. Ct. App. June 10, 2010).

60

Sections 25400 and 25500 on the theory that they had been defrauded into doing so by false and misleading statements by Marsh & McLennan, which had purchased its own common shares in the marketplace for various purposes. The trial court granted summary judgment for the defendants, and the Court of Appeal – adopting substantially the position advocated here by the defendants – affirmed on the basis that (a) the plaintiffs had written, or "sold," put options, (b) these were not the same securities that Marsh & McLennan had bought, and (c) these statutes therefore did not apply.[223]

The Court is mindful of the fact a respected district judge in Washington State has disagreed with the California trial court's reading of the statutes in question.[224] But while that decision post-dated the Court of Appeal decision in *McMahon* by a few days, the opinion makes clear that the Washington district court was unaware of the appellate court's affirmance of the trial court ruling with which the Washington court had disagreed. While there is merit to Washington court's view, the Court is not persuaded that the California Supreme Court would adopt it rather than the contrary position taken by the California Court of Appeal. Accordingly, the claim under Sections 25400 and 25500 will be dismissed.

2.    *Willful Intent*

The Individual Defendants argue, in the alternative, that the claims under Sections 25400 and 25550 are insufficient on the ground that the CFAC does not plead willful intent as require by the statute. They are correct as to the non-officer Individual Defendants, who are not even named

---

[223]
　　　　　*Id.* at *13.

[224]
　　　　　*In re Washington Mutl., Inc. Secur., Deriv. & ERISA Litig.,* No. 2:08-md-1919 MJP, 2010 WL 2545415, at *8-9 (W.D. Wash. June 21, 2010).

in the federal securities law fraud claims let alone subjects of any allegations of *scienter* or fraudulent intent.  Accordingly, the Section 25400 and 25550 claims must be dismissed as to them in any event. The same is true as to the Officer Defendants to the extent that the Exchange Act claims against them were found insufficiently to allege *scienter.*

       **B.**      *Sections 25504 and 25504.1*

       Section 25401 of the California Corporations Code makes it unlawful for "any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading."[225]  Section 25501 creates a private right of action for "any person who purchases a security" from "[a]ny person who violates Section 25401.[226]  Section 25504 provides in turn that "[e]very person who directly or indirectly controls a person liable under Section 25501 . . . [and] who materially aids in the act or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as such person."[227]  Finally, Section 25504.1 creates liability for those who, *with intent to deceive or defraud*, materially assist in a violation of Section or 25401.

       The CFAC asserts claims against the Individual Defendants and the Underwriter Defendants under Section 25504, and against the Officer Defendants under Section 25504.1. In order to prevail under either section, however, plaintiffs must allege a primary violation under Sections

---

[225]       CAL. CORP. CODE § 25401.

[226]       *Id.* § 25501.

[227]       *Id.* § 25504.

25401 and 25501.[228]  Liability for primary violations is limited to actual sellers of securities.[229]

Accordingly, California courts have held that strict privity is required between the primary violator

and the plaintiff.[230]  The CFAC alleges that Lehman, defined as Lehman Brothers Holdings Inc.,[231]

was a "primary participant" that "violated California Corporations Code §§ 25401 and 25501 by its

acts and omissions as alleged" in the CFAC.  Defendants argue that plaintiffs have failed to allege

that Lehman – the alleged primary violator – was an actual seller and thus have failed to allege privity

as required by the statute.

The Underwriter Defendants note that all of the offerings at issue were "firm

commitment" underwritings.[232]  "In a firm commitment underwriting, the corporation and selling

shareholders sell the shares, eventually to be offered to the public, directly to the underwriting

syndicate. The underwriters, in turn, sell to the public or to brokers and dealers."[233]  Thus, defendants

---

[228]

*Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1453 (S.D. Cal. 1988) ("the causes of action provided for in sections 25501, 25504, [and] 25504.1 . . .are by their terms derived from section 25401").

[229]

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 70 Cal. Rptr. 3d 199, 221 (2007).

[230]

*See S. E. C. v. Seaboard Corp.*, 677 F.2d 1289, 1296 (9th Cir. 1982); *Apollo Capital Fund, LLC*, 70 Cal. Rptr. 3d at 221; *In re ZZZ Best Sec. Litig.*, No. CV 87-3574, 1990 WL 132715, at *17 (C.D. Cal. July 21 1990) (primary violator of Section 25504 "must be alleged to be in privity with the plaintiffs").

[231]

CFAC ¶ 1.

[232]

*See* Gibbon Decl. [DI 597], Exs. 1-6, 12-13, 16-17, 27 (offering documents for the different purchases, indicating, *inter alia*, that "the underwriters have advised Lehman Brothers Holdings that they propose to initially offer the notes to the public . . . .").

[233]

*In re Fortune Sys. Sec. Litig.*, 604 F. Supp. 150, 160 (N.D. Cal. 1984).

63

claim that Lehman, as the issuer of those securities, could not have been in privity with any of the plaintiffs because it is the underwriters, not the issuer, who sell firm commitment underwritings.[234] Defendants are correct.[235]

Plaintiffs respond by noting that LBI, Lehman's "broker/dealer subsidiary,"[236] "was the primary underwriter for each of the Offerings, selling anywhere from 90% to 99% of the Securities issued."[237]  Accordingly, they assert that they were in privity with LBI as well as the other Underwriter Defendants.[238]  But this does not cure the CFAC's defects under Section 25500.  It is Lehman, not LBI, that is alleged by the CFAC to have been the primary violator.[239]  Thus even if plaintiffs were in privity with LBI – a determination this Court need not make – there still would not be a primary violation adequately alleged as to Lehman.

---

[234]

DI 577, at 17-19..

[235]

See  In re Fortune Sys. Sec. Litig., 604 F. Supp. at 160 (N.D. Cal. 1984) (finding no direct privity for purposes of claim under Section 12(2) of the Securities Act where defendants' "common stock offering was by means of a 'firm commitment' underwriting"); Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987) ("The offering here was made pursuant to a "firm commitment underwriting," as the prospectus indicated.  Title to the securities passed from Oryx to the underwriters and then from the underwriters to the purchaser-plaintiffs.  Oryx, therefore, was not in privity with the [purchasers] for section 12(2) purchases."); In re Marsh & McLennan Cos., Sec. Litig., 501 F. Supp. 2d 452, 496 n.20 (S.D.N.Y. 2006) (under New Jersey Uniform Securities Law, "firm commitment underwriting . . . does not create privity between an issuer and its investors.  This is for the simple reason that investors do not acquire title directly from the issuer, but from the underwriters who have purchased the securities for sale to investors").

[236]

CFAC ¶ 135.

[237]

DI 715, at 46.

[238]

Id.

[239]

CFC ¶ 492.

Plaintiffs assert also that their purchases were issuer transactions and that they therefore are in privity with Lehman, the issuer of the securities.[240]  But the lone case they cite for this proposition, *Moss v. Kroner*,[241] offers them no support.  Indeed, *Moss* involved an "issuer" that had directly "offered and sold" to the plaintiff the security at issue.[242]  Here, Lehman is alleged only to have "issue[d]" the securities, not to have offered or sold them *to the plaintiffs*.[243]

Plaintiffs' arguments on this point are ultimately unpersuasive.  The allegations of the CFAC speak for themselves.  The CFAC does not allege from whom or in what manner plaintiffs purchased these securities.[244]  Thus, the CFAC does not adequately allege that plaintiffs were in privity with *any* "seller" of the offerings at issue and so it does not adequately allege a primary violation of the relevant statutes.[245]  Accordingly, Plaintiffs' Section 25504 and 25504.1 claims are

---

[240]

DI 715, at 45-46.

[241]

129 Cal. Rptr. 3d 220, 232 (Cal. Ct. App. 2011).

[242]

*Moss,* 129 Cal. Rptr. 3d at 228-29.  Indeed, *Moss* stands only for the proposition that, the alleged "control persons" in a Section 25504 claim need not be in privity with the plaintiffs.  The court is clear, however, that privity is required to establish the underlying Section 25501, from which Section 25504 is derived.  *Id.* ("The need for privity stems from the liability derived from § 25501 which the courts have uniformly interpreted to require privity . . . . The person alleged to be controlled by the defendants must be alleged to be in privity with the plaintiffs") (internal citation and quotation marks omitted).

[243]

CFAC ¶¶ 456, 459, 490.

[244]

*See* CFAC ¶¶ 492, 296 (identifying Lehman as "primary participant," but not alleging privity with Lehman, and stating that Underwriter Defendants "provided material aid to Lehman in connection with the sale" but not identifying who made the sale or how it was conducted); *see also id.* ¶¶ 24, 34, 43, 51, 60, 70, 80 (identifying purchases made, but not alleging how the sales were conducted).

[245]

As defendants note, plaintiffs' purchases that were made on the secondary market  do not put them in privity with Lehman, regardless of how the securities are classified – as "firm commitment underwriting" or "issuer transactions."  DI 770, at 7.  Plaintiffs do not dispute

65

dismissed.[246]

> D.      *Section 25504.2 Claims as to Ernst & Young*

Section 25504.2 provides that any "accountant . . . or other person whose profession gives authority to a statement made by such person" and who has been "named in any prospectus or offering circular as having prepared or certified in such capacity . . . any part of such document . . . is jointly and severally liable with any other person liable under Section 25501" for violations of Section 25401.[247] Ernst & Young moves to dismiss the Section 25504.2 claim against it only insofar as it joins in three arguments made by the Underwriter Defendants in their motion to dismiss the Section 25504 claims.[248]

As plaintiffs have failed to allege that any defendants violated Section 25401,[249]

---

this point.

[246]

Plaintiffs seek leave to amend to add the Underwriter Defendants as primary violators of Sections 25401 and 25501. *See* DI 715, at 47. Putting aside the fact that the Court set a deadline for amendments to the pleadings which has passed, *see* Pretrial Order No. 23, Nov. 9, 2011, Dkt. No. 502, it is not clear that such amendment would cure plaintiffs' claims. First, several – if not all – of plaintiffs' claims against the Underwriter Defendants are likely time-barred. Second, plaintiffs concede that LBI – not the Underwriter Defendants – "was the primary underwriter for each of the Offerings, selling anywhere from 90% to 99% of the Securities Issued." DI 715, at 46. Plaintiffs thus cannot allege privity between them and the Underwriter Defendants as required to state a claim under Sections 25401 or 25501.

[247]

CAL. CORP. CODE § 25504.2.

[248]

*See* DI 624, at 4. Those arguments are "(1) plaintiffs fail to plead a primary violation of California state law, (2) those plaintiffs continuing to hold Lehman securities can obtain only rescission, a remedy non sellers such as . . . [Ernst & Young] cannot provide, and (3) SLUSA precludes the state law claims brought by Zenith Insurance Company." *Id.*

[249]

*Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1453 (S.D. Cal. 1988) ("Because the cause[]of action provided for in section[] 25504.2 [is] by [its] terms derived from section 25401, a failure to show strict privity will defeat [this] derivative claim.").

66

plaintiffs' Section 25504.2 claims against E &Y must be dismissed.

*Conclusion*

The Underwriter Defendants' motions to dismiss the CFAC [09 MD 2017, DI 574; DI 596] are granted.[250]  HVB's motion to dismiss [09 MD 2017, DI 598] is granted to the extent it is asserted against the cases included in the CFAC.[251]  The Individual Defendants' motion to dismiss the CFAC [09 MD 2017, DI 633] is granted in part and denied in part as set forth above.  Ernst & Young's motion to dismiss [DI 623] – to the extent it is asserted against the cases included in the CFAC[252] – is granted in part and denied in part as set forth above.

The defendants shall settle an order more fully setting forth the rulings made above. The Court would be grateful for an order agreed as to form by all parties.  Absent agreement, defendants shall settle their proposed order, on seven days' notice. The agreed or proposed order shall be submitted no later than October 24, 2012.

SO ORDERED.

Dated:        October 15, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

250

The joinders of underwriters M.R. Beal & Co [DI 660] and Williams Capital Group [DI 616] in the Underwriter Defendants' motion to dismiss means that any asserted claims as to these defendants are dismissed also.

251

The motion is directed also at cases and pleadings that are not dealt with in this decision and to that extent remains pending.

252

Ernst & Young's motion, like that of HVB, also is directed at cases and pleadings not dealt with in this decision.  Its motion too remains pending to that extent.

APPENDIX

| Plaintiff | Security Purchased | Purchase Date | Original Complaint Filed |
|---|---|---|---|
| Auburn | 52517PSC6 | 3/31/2008 | 2/19/2009 |
| Burbank | 52517PG96 | 5/9/2006 | 2/18/2009 |
| | 525M0BZ9 | 1/29/2008 | 2/18/2009 |
| Contra Costa | 52517PR60 | 2/5/2008 | 6/2/2009 |
| Monterey | 52517PG21 | 10/1/2007 | 12/1/2008 |
| San Mateo | 52517PXU0 | 10/25/2004 | 11/13/2008 |
| | 52517PC58 | 10/24/2005 | 11/13/2008 |
| | 52517PK83 | 8/21/2006 | 11/13/2008 |
| | 52517PN98 | 11/16/2006 | 11/13/2008 |
| | 52517PQ46 | 12/21/2006 | 11/13/2008 |
| | 52517PW31 | 3/23/2007 | 11/13/2008 |
| | 52517P2K6 | 5/25/2007 | 11/13/2008 |
| | 5252M0BZ9 | 1/22/2008 | 11/13/2008 |
| | 52517PK83 | 2/15/2008 | 11/13/2008 |
| Vallejo | 52517PYN5 | 1/10/2008 | 5/15/2009 |
| | 52517PXT3 | 1/22/2008 | 5/15/2009 |
| | 5252M0BZ9 | 1/30/2008 | 5/15/2009 |
| Ventura | 5252M0BZ9 | 2/5/2008 | 2/17/2009 |
| Zenith | 52517PA35 | 8/18/2005 | 11/19/2008 |
| | 52517PA35 | 9/26/2006 | 11/19/2008 |
| | 52517PA35 | 8/8/2007 | 11/19/2008 |